No. 76,624

LAYTON RANDALL LEMUZ, a minor, by and through Randall R. Lemuz and Sandra J. Lemuz, his mother and father, natural guardians and next friends, and RANDALL R. LEMUZ and SANDRA J. LEMUZ, individually, *Plaintiffs*, v. MERLE J. FIESER, M.D., WILLIAM T. KING, M.D., and CENTRAL KANSAS MEDICAL CENTER, *Defendants*.

933 P.2d 134

Opinion filed March 7, 1997.

*Mark A. Furney*, of Overland Park, argued the cause, and *Donald S. Andersen* and *James Long*, of Andersen & Long, of Wichita, were with him on the briefs for plaintiffs.

*Steven C. Day*, of Woodard, Blaylock, Hernandez, Roth & Day, of Wichita, argued the cause and was on the briefs for defendants.

*Randall E. Fisher*, of Law Offices of Randall E. Fisher, of Wichita, was on the brief for *amicus curiae* Kansas Trial Lawyers Association.

*Marta Fisher Linenberger* and *Wayne T. Stratton*, of Goodell, Stratton, Edmonds & Palmer, L.L.P., of Topeka, were on the brief for *amicus curiae* Kansas Hospital Association.

The opinion of the court was delivered by

ABBOTT, J.: This case is before the court on a question certified by the United States District Court for the District of Kansas under the Uniform Certification of Questions of Law Act, K.S.A. 60-3201 *et seq.* Judge Frank G. Theis certified to this court the following question:

"Does K.S.A. 65-442(b) or K.S.A. 40-3403(h), as interpreted in the case of *McVay v. Rich*, 255 Kan. 371, 874 P.2d 641 (1994), violate either Section 1 or Section 18 of the Bill of Rights of the Kansas Constitution?"

The facts, as set forth in the district court's order certifying this question, are as follows:

"[T]his is essentially a medical malpractice action filed by the minor plaintiff and his parents against two medical doctors, Merle Fieser, M.D. and William King, M.D. and Central Kansas Medical Center. The action arises out of the birth of Layton Randall Lemuz at Central Kansas Medical Center (CKMC). Dr. Fieser was the treating physician during Sandra Lemuz's pregnancy and was the attending physician at delivery. Dr. King's role is not specified in the complaint. Plaintiffs allege that Dr. Fieser was negligent in her care and treatment of Sandra Lemuz

and in the delivery and subsequent treatment of Layton Randall Lemuz. Plaintiffs allege negligence on the part of CKMC in granting obstetrical privileges to Dr. Fieser, when CKMC was aware of Dr. Fieser's alleged incompetence. Plaintiffs further allege negligence on the part of CKMC in its failure to order Dr. Fieser to transfer the minor plaintiff to a hospital with the personnel and facilities to care for a neurologically depressed newborn. Both Layton Randall Lemuz and his mother Sandra J. Lemuz allege personal injuries as a result of the defendant's conduct.

"The certification issue arose from CKMC's motion for partial summary judgment. In that motion, CKMC argues that it cannot be held liable for damages caused by Dr. Fieser's alleged negligence, since Dr. Fieser was not an employee of CKMC. CKMC's argument is based on K.S.A. 40-3403(h) and 65-442(b), and *McVay v. Rich*, 255 Kan. 371 (1994).

"K.S.A. 40-3403(h) provides in pertinent part:

'A health care provider who is qualified for coverage under the [health care stabilization] fund shall have no vicarious liability or responsibility for any injury or death arising out of the rendering of or the failure to render professional services inside or outside this state by any other health care provider who is also qualified for coverage under the fund.'

"K.S.A. 65-442(b) provides:

'There shall be no liability on the part of and no action for damages shall arise against any licensed medical care facility because of the rendering of or failure to render professional services within such medical care facility by a person licensed to practice medicine and surgery if such person is not an employee or agent of such medical care facility.'

"In *McVay v. Rich*, 255 Kan. 371, 374-78 (1994), the Kansas Supreme Court held that these two statutes bar a claim of medical malpractice against a licensed hospital based on the rendering or failure to render professional services within the hospital by a physician who is licensed to practice medicine and who is covered under the Health Care Stabilization Fund if that physician is not an agent or employee of the hospital. The court refused to address a challenge to the constitutionality of the two statutes because that argument had not been raised below. *Id.* at 378-80.

"The parties are in agreement that Kansas law does not recognize the so-called 'corporate negligence' doctrine as it relates to hospitals—in other words, there is no cause of action against a hospital based upon a claim that the hospital negligently granted hospital privileges to a non-employee physician. Plaintiffs concede that the law, as presently interpreted, bars their claim for corporate negligence against CKMC. In response [to] CKMC's motion for summary judgment, plaintiffs argued that K.S.A. 40-3403(h) and 65-442(b) violated various provisions of the Kansas and United States Constitutions. Plaintiffs' arguments in opposing defen-

dant's motion for summary judgment focus primarily on Kansas law, not federal constitutional principles.

"Plaintiffs argue that the statutes deprive plaintiffs of due process of law, in violation of section 18 of the Kansas Bill of Rights and the Fourteenth Amendment to the United States Constitution. Plaintiffs further argue that the statutes deprive plaintiffs of equal protection of the laws, in violation of section 1 of the Kansas Bill of Rights and the Fourteenth Amendment to the United States Constitution.

"Plaintiff[s] oppose the motion to certify. Plaintiffs request that this court address the state constitutional issues in conjunction with the federal constitutional issues. The court declines the invitation and shall grant the motion to certify. The court shall address the federal constitutional issues when and if the occasion arises.

"The parties acknowledge that the Kansas Supreme Court has addressed the constitutionality of K.S.A. 40-3403(h) on one occasion. In *Bair v. Peck*, 248 Kan. 824 (1991), the Kansas Supreme Court held that K.S.A. 40-3403(h) did not violate Section 1 (equal protection), Section 5 (right to trial by jury) or Section 18 (due process) of the Bill of Rights of the Kansas Constitution. *Bair* apparently involved an employer/employee relationship (respondeat superior) and not an independent contractor relationship (corporate negligence). Thus, while the Kansas Supreme Court has upheld 40-3403(h) in the context of respondeat superior, that court has not addressed the constitutionality of that provision in the context of corporate negligence. While this court does not believe this factual difference is dispositive, the plaintiffs believe otherwise.

"If this court were faced with a challenge to section 40-3403(h) only, the court would deny the motion to certify. However, since the Kansas Supreme Court has not had the opportunity to address the constitutionality of K.S.A. 65-442(b), the court finds it appropriate to certify the question as presented. A determination on the constitutionality of the two statutes may be determinative of the claims against CKMC. There is no controlling precedent on the constitutionality of K.S.A. 65-442(b). While this court believed that the Kansas Supreme Court's decision in *Bair v. Peck* is determinative of the constitutionality of K.S.A. 40-3404(h), the parties are entitled to present their arguments to that court regarding the distinction between employee and independent contractor."

This court gave leave to the Kansas Hospital Association and the Kansas Trial Lawyers Association to file *amicus curiae* briefs in this case.

K.S.A. 40-3403(h) provides:

"A health care provider who is qualified for coverage under the [health care stabilization] fund shall have no *vicarious liability or responsibility* for any injury or death arising out of the rendering of or the failure to render professional services inside or outside this state by any other health care provider who is also qualified for coverage under the fund. The provisions of this subsection shall apply to all claims filed on or after [July 1, 1986]." (Emphasis added.)

The plaintiffs' claim is not based on vicarious liability. Instead, the plaintiffs allege that the hospital (CKMC) was independently negligent because it allowed Dr. Fieser to continue working on its staff, even though the hospital was aware of Dr. Fieser's alleged incompetence. Plaintiffs also allege negligence on the part of CKMC because it failed to order Dr. Fieser to transfer Layton Randall Lemuz to a hospital which had the facilities to care for a neurologically depressed newborn.

According to the plaintiffs, K.S.A. 40-3403(h) was adopted in response to the court's decision in *McGuire v. Sifers*, 235 Kan. 368, 681 P.2d 1025 (1984), which held that the doctrine of respondeat superior was applicable to professional corporations. Thus, the plaintiffs assert that K.S.A. 40-3403(h) only concerns and absolves health care providers of vicarious liability, rather than independent acts of negligence as the plaintiffs allege herein. Since, according to the plaintiffs, K.S.A. 40-3403(h) does not apply to or prohibit their claim of independent negligence against the hospital, the plaintiffs allege that constitutionality of 40-3403(h) is irrelevant here, despite the wording of the certified question.

However, in the case of *McVay v. Rich*, 255 Kan. 371, 874 P.2d 641 (1994), the plaintiff filed suit against a hospital, alleging that the hospital was independently negligent for continuing to grant hospital staff privileges to a nonemployee, nonagent physician when the hospital knew or should have known that the physician was incompetent. In *McVay*, this court held that 40-3403(h) applied to and in part prohibited the plaintiff's claim against the hospital, along with 65-442(b), even though the claim was one of independent liability, not just vicarious liability. This conclusion was based on the statutory language which provides that "[a] health care provider . . . shall have no vicarious liability or *responsibility* for any injury or death arising out of . . . ." (Emphasis added.) K.S.A. 40-3403(h). *McVay* interpreted the italicized term above as absolving a hospital not just from vicarious liability but from any responsibility, including independent liability, for the acts of a physician. Under this interpretation, a hospital could not be independently negligent for the injury or death of a patient arising out of the negligence of a nonemployee, independent contractor physi-

cian who was covered by the Health Care Stabilization Fund, even if the hospital allowed the physician to continue working on its staff knowing that the physician was incompetent (corporate negligence). Thus, K.S.A. 40-3403(h) does apply and prohibit the plaintiff's claim of corporate negligence against the hospital. As such, the constitutionality of this statute is important.

In *Bair v. Peck*, 248 Kan. 824, 811 P.2d 1176 (1991), this court addressed the constitutionality of K.S.A. 40-3403(h). This court found that K.S.A. 40-3403(h) "bears a reasonable relationship to the objectives sought by the legislature and does not violate Section 1 of the Bill of Rights of the Kansas Constitution." 248 Kan. at 834. Further, this court found that the Health Care Provider Insurance Availability Act (Act), K.S.A. 40-3401 *et seq.*, which is "a comprehensive compulsory insurance plan mandating minimum amounts of malpractice insurance as a condition of providing health care in Kansas," was an adequate quid pro quo or substitute remedy for the abrogation of the common-law remedy of vicarious liability against hospitals, even though this substitute remedy was not adopted simultaneously with the abrogation of the common-law remedy. Thus, this court held that 40-3403(h) was not unconstitutional under § 18 of the Kansas Constitution Bill of Rights. 248 Kan. at 844. *Bair* analyzed 40-3403(h) as if it only abrogated vicarious liability against hospitals, not as if it also abrogated independent liability against hospitals for negligently granting staff privileges to incompetent nonemployee physicians. Judge Theis certified the question so the plaintiffs could make the argument that this distinction in the application of K.S.A. 40-3403(h) altered the constitutional analysis of the statute. The plaintiffs do not make this argument. Instead, the plaintiffs argue that 40-3403(h) does not apply to their corporate negligence claim at all. Even if the plaintiffs had made this argument, distinguishing between vicarious liability and corporate negligence in determining whether 40-3403(h) violates the constitution, it would have failed.

The discussion and conclusion in *Bair*—that 40-3403(h) does not violate § 1 or § 18 of the Kansas Constitution Bill of Rights—is broad enough to apply to 40-3403(h) even if the statute does more than it was assumed to do in *Bair* by prohibiting not only actions

for vicarious liability against hospitals, but also prohibiting actions for independent liability/corporate negligence against hospitals. See *Bair*, 248 Kan. at 830-34; 836-45. Thus, the plaintiffs' argument—that if 40-3403(h) prohibits an independent liability/corporate negligence action against a hospital, then the statute is an unconstitutional violation of § 1 or § 18 of the Kansas Constitution Bill of Rights—must fail.

Finally, the determination of whether K.S.A. 40-3403(h), as interpreted in *McVay*, 255 Kan. 371, violates either § 1 or § 18 of the Kansas Constitution Bill of Rights is irrelevant. This is because the second statute at issue in this certified question, K.S.A. 65-442(b), discussed below, also prohibits the plaintiffs' independent liability/corporate negligence action against the hospital in this case, and the statute is constitutional under § 1 and § 18 of the Kansas Constitution Bill of Rights. Thus, the plaintiffs' action against the hospital is properly barred by K.S.A. 65-442(b), regardless of the interpretation of 40-3403(h) and its constitutionality.

K.S.A. 65-442(b) provides:

"There shall be no liability on the part of and no action for damages shall arise against any licensed medical care facility *because of* the rendering of or failure to render professional services within such medical care facility by a person licensed to practice medicine and surgery if such person is not an employee or agent of such medical care facility." (Emphasis added.)

According to the certified facts, Dr. Fieser was not an employee or agent of CKMC. Any liability against CKMC for allowing Dr. Fieser to continue working on its staff when CKMC was aware of or should have been aware of Dr. Fieser's alleged incompetence or any liability against CKMC for failing to order Dr. Fieser to transfer Layton Randall Lemuz to a hospital which had the facilities to care for him is *because of* the failure to render professional services by Dr. Fieser, who is not an employee or agent of CKMC. Thus, K.S.A. 65-442(b) prohibits the plaintiffs' independent liability/corporate negligence action against CKMC. *McVay*, 255 Kan. 371, Syl. ¶ 1. However, the plaintiffs allege that K.S.A. 65-442(b) is invalid and does not prohibit their claim because it is in violation of the Kansas Constitution.

## Section 1 of the Kansas Constitution Bill of Rights

Section 1 of the Kansas Constitution Bill of Rights provides:

"**Equal Rights.** All men are possessed of equal and inalienable natural rights, among which are life, liberty, and the pursuit of happiness."

This section is typically considered the Equal Protection Clause of the Kansas Constitution. See *Stephens v. Snyder Clinic Ass'n*, 230 Kan. 115, 128, 631 P.2d 222 (1981). In their primary brief, the plaintiffs assert that 65-442(b) violates § 1 of the Kansas Constitution Bill of Rights. However, in their reply brief, the plaintiffs "abandon and waive, here and upon return to the United States District Court, their right to challenge these statutes based on the Kansas Constitution's guarantee of equal protection." The plaintiffs ask this court to "resist the defendant's invitation to consider the constitutionality of these statutes against an equal protection challenge" because "[d]oing so would be nothing less than . . . an advisory opinion." Since the plaintiffs have abandoned their equal protection challenge of this statute, it is not necessary to analyze the constitutionality of K.S.A. 65-442(b) under § 1, the Equal Protection Clause of the Kansas Constitution Bill of Rights.

## Section 18 of the Kansas Constitution Bill of Rights

Determining whether a statute violates the constitution is a question of law. When determining a question of law, this court may exercise an unlimited de novo standard of review. See *State v. Mertz*, 258 Kan. 745, 748, 907 P.2d 847 (1995). "A statute is presumed constitutional, and all doubts must be resolved in favor of its validity. If there is any reasonable way to construe a statute as constitutionally valid, the court must do so. A statute must clearly violate the constitution before it may be struck down." *State v. Scherzer*, 254 Kan. 926, Syl. ¶ 6, 869 P.2d 729 (1994); *Boatright v. Kansas Racing Comm'n*, 251 Kan. 240, 243, 834 P.2d 368 (1992). "This court not only has the authority, but also the duty, to construe a statute in such a manner that it is constitutional if the same can be done within the apparent intent of the legislature in passing the statute." *State v. Durrant*, 244 Kan. 522, 534, 769 P.2d 1174, *cert. denied* 492 U.S. 923 (1989).

The plaintiffs contend that K.S.A. 65-442(b) unconstitutionally violates § 18 of the Kansas Constitution Bill of Rights, which provides:

"**Justice without delay.** All persons, for injuries suffered in person, reputation or property, shall have remedy by due course of law, and justice administered without delay."

The defendants assert that K.S.A. 65-442(b) does not violate § 18 because the statute does not implicate any interest protected by § 18. The defendants point out that the provisions of § 18 preserve the right to remedy by due course of law "only as to civil causes of action that were recognized as justiciable by the common law as it existed at the time our constitution was adopted." *Leiker v. Gafford*, 245 Kan. 325, 361, 778 P.2d 823 (1989), *overruled on other grounds Martindale v. Tenny*, 250 Kan. 621, 629, 829 P.2d 561 (1992). See *Smith v. Printup*, 254 Kan. 315, 332, 866 P.2d 985 (1993); *Cott v. Peppermint Twist Mgt. Co.*, 253 Kan. 452, 481, 856 P.2d 906 (1993). Under the defendants' interpretation of this language, § 18 only protects common-law remedies as they existed at the time the Kansas Constitution was adopted and does not apply to or protect later judicial expansions of such remedies, such as the corporate negligence doctrine. According to the defendants, the corporate negligence doctrine did not exist at the time the Kansas Constitution was adopted. Instead, the doctrine was first developed in 1965 in the case of *Darling v. Charleston Hospital*, 33 Ill. 2d 326, 211 N.E.2d 253 (1965), *cert. denied* 383 U.S. 946 (1966). Before this case, the defendants argue, it was universally agreed that hospitals were not liable for the negligence of nonemployee members of the medical staff and were not required to use reasonable care in recruiting staff physicians. See *Insinga v. LaBella*, 543 So. 2d 209, 212 (Fla. 1989). Since a cause of action for corporate negligence was not recognized at the time the Kansas Constitution was adopted, but is a judicial expansion of common-law negligence remedies, the defendants contend that the legislative preclusion of that cause of action by 65-442(b) does not implicate § 18. We disagree.

The plaintiffs' claim of corporate negligence against the hospital is based upon the basic principle of negligence, a common-law remedy which was recognized at the time the Kansas Constitution was adopted. In *McVay*, 255 Kan. 371, this court interpreted K.S.A. 65-442(b) to determine if it precluded corporate negligence lawsuits against hospitals. We noted that the theory of corporate negligence recognizes a "[hospital's] liability for negligently retaining or employing an independent contractor" because " 'hospitals have an independent duty to ensure the health and safety of their patients,' " including "the duty to exercise reasonable care in granting, reviewing, and extending staff privileges." 255 Kan. at 374-75. Once this new duty for hospitals is plugged into an old cause of action, negligence, the hospital's liability under the corporate negligence doctrine develops. See *Teft v. Wilcox*, 6 Kan. *46 (1870) (finding that the common law allowed for the recovery of damages for negligent injuries), cited in *Kansas Malpractice Victims Coalition v. Bell*, 243 Kan. 333, 342, 757 P.2d 251 (1988), *overruled in part on other grounds Bair*, 248 Kan. 824.

Thus, corporate negligence causes of action are not "new" causes of action but are simply different applications of the basic concepts of negligence which existed at common law when the Kansas Constitution was adopted. As such, corporate negligence causes of action are protected by § 18. If this were not the case, then any evolution of negligence law since the time the Kansas Constitution was adopted could be abrogated without implicating § 18. Since K.S.A. 60-442(b) precludes a corporate negligence cause of action, it implicates § 18.

The defendants further argue that 65-442(b) and its preclusion of the corporate negligence doctrine do not implicate § 18 because the corporate negligence doctrine is merely a theory of recovery and not a separate remedy entitled to independent protection under § 18. The defendants point out that 65-442(b) does not provide hospitals with blanket immunity from tort liability or from the collection of tort damages. Instead, the defendants claim the plaintiffs remain free to pursue all traditional remedies against a hospital/defendant, except for this type of recovery for injuries caused by a staff physician. However, if the plaintiffs are able to prove a staff

physician's negligence caused their injury, then, according to the defendants, the plaintiffs will still receive a full *remedy* in the form of a judgment against the staff physician, even if the plaintiffs cannot sue the hospital for corporate negligence based on these injuries. Thus, for their personal injury suffered, the plaintiffs still have a remedy by due course of law by suing the staff physician. As such, the defendants contend that the plaintiffs are not deprived of a *remedy* for their injuries under 65-442(b), but are merely precluded from a certain type of recovery for their injuries, that is, suing the hospital for corporate negligence. Hence, the defendants allege that 65-442(b) does not abrogate a remedy or implicate § 18. We disagree.

Under the corporate negligence doctrine, a hospital has an independent duty to insure the health and safety of its patients by exercising reasonable care in the granting, reviewing, and extending staff privileges to independent contractor physicians. The plaintiffs' action against the hospital is not just another form of recovery for the breach of the doctor's duty. Instead, it is a separate remedial action taken to recover for a separate breach of the hospital's duty. While the plaintiffs are not entitled to recover twice for the same injury caused by two separate breaches of two independent duties, the plaintiffs are entitled to seek a remedy from each defendant who breached a duty owed to them, and then keep only one recovery. K.S.A. 65-442(b) prevents the plaintiffs from seeking a remedy against the hospital for the hospital's breach of a duty owed to the plaintiffs. We hold that the right to seek this remedy existed at common law when the Kansas Constitution was adopted; thus, 65-442(b) and its preclusion of this remedy implicate § 18.

Section 18 of the Kansas Constitution Bill of Rights is the section which provides due process protection. The standard in Kansas for reviewing § 18 due process challenges is:

"If a remedy protected by due process is abrogated or restricted by the legislature, 'such change is constitutional if "the change is reasonably necessary in the public interest to promote the general welfare of the people of the state," *Manzanares v. Bell*, 214 Kan. 589, 599, 522 P.2d 1291 (1974), and the legislature provides an adequate substitute remedy' to replace the remedy which has been

restricted." *Bonin v. Vannaman*, 261 Kan. 199, 217, 929 P.2d 754 (1996) (citing *Aves v. Shah*, 258 Kan. 506, 521, 906 P.2d 642 [1995]).

The plaintiffs assert that this is an inappropriate standard to use in reviewing § 18 challenges because § 18 does more than just protect against due process violations. The plaintiffs argue that they have a right to bodily integrity, including the right not to be exposed to an incompetent physician. The plaintiffs also argue that private law duties and remedies give substance to this fundamental right of bodily integrity. According to the plaintiffs, § 18 is a recognition of the State's duty to implement and enforce private law. The plaintiffs claim that the right to receive a remedy for the breach of the hospital's private law duty to protect their bodily integrity is specifically protected by § 18, and when this right is taken away by statute, the statute violates § 18.

Based on this analysis, the plaintiffs contend that § 18 is more than just the state's equivalent to federal due process protection. Instead, the plaintiffs assert that § 18 is a separate and distinct clause of the Kansas Constitution which is designed to protect fundamental rights of bodily integrity. Plaintiffs complain that since § 18 is a specific clause of the Kansas Constitution which provides protection for fundamental rights of bodily integrity, not just due process protection, the rational basis test is not a strict enough standard to apply when evaluating possible § 18 violations.

Instead of using the rational basis test to evaluate § 18 challenges, the plaintiffs ask this court to draw from both the heightened scrutiny doctrine of equal protection and the compelling state interest test of substantive due process to determine that legislation will only be upheld under § 18 if it is narrowly tailored to substantially further a legitimate interest of the State. The plaintiffs claim that such a test would allow for meaningful judicial review of a specific clause of the Kansas Constitution.

Section 18 is already reviewed under a standard which is more stringent than the rational basis test. This court uses the rational basis test for some equal protection challenges raised under § 1 of the Kansas Constitution Bill of Rights. This test, also known as the reasonable basis test, provides:

" 'The "reasonable basis" test is violated only if the statutory classification rests on grounds wholly irrelevant to the achievement of the state's legitimate objective. The state legislature is presumed to have acted within its constitutional power, even if the statute results in some inequality. Under the reasonable basis test, a statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.' " *Aves,* 258 Kan at 525 (quoting *Leiker,* 254 Kan. at 363-64).

This court does not use such a standard for § 18 due process challenges. Instead, this court uses the quid pro quo test to review challenges under § 18. This test provides:

"If a remedy protected by due process is abrogated or restricted by the legis-lature, 'such change is constitutional if "[1] the change is reasonably necessary in the public interest to promote the general welfare of the people of the state," *Manzanares v. Bell,* 214 Kan. 589, 599, 522 P.2d 1291 (1974), and [2] the legis-lature provides an adequate substitute remedy' to replace the remedy which has been restricted.' " *Bonin,* 261 Kan. at 217 (citing *Aves,* 258 Kan. at 521).

Under this test, Step 1 is similar to a rational basis test analysis. In referring to an analysis under Step 1 of the § 18 test, the *Bonin* court stated that " '[t]he test in determining the constitutionality of a statute under due process or equal protection weighs almost identical factors.' " *Bonin,* 261 Kan. at 218 (quoting *Clements v. United States Fidelity & Guaranty Co.,* 243 Kan. 124, 127, 753 P.2d 1274 [1988]). However, this is not where the § 18 review stops.

"[E]ven if the modification of a common-law remedy is consistent with public policy, this does not necessarily satisfy the due process concerns. In order to insure due process, the legislature is required to provide an adequate, substitute remedy when a common-law remedy, such as [a corporate negligence claim against a hospital] is modified or abolished." *Aves,* 258 Kan. at 522 (citing *Jenkins v. Am chem Products, Inc.,* 256 Kan. 602, 628, 886 P.2d 869 [1994], *cert. denied* 516 U.S. 820 [1995]).

Obviously, this test is more stringent than the rational basis test because it requires a substantive quid pro quo to replace any com-mon-law remedy that has been extinguished by statute. Thus, the plaintiffs' challenge of the "rational basis test" under § 18 has no merit.

The real question in this case is whether, under the quid pro quo test, K.S.A. 65-442(b) violates § 18. Under the § 18 quid pro

quo test, the first step is to ask whether there is a significant public interest to justify the abrogation of the corporate negligence cause of action against a hospital even though the hospital may have been negligent in allowing an incompetent physician to retain staff privileges.

Under Step 1, "if a remedy protected by § 18 is modified or abrogated by the legislature, such change is constitutional if the change is reasonably necessary in the public interest to promote the general welfare of the people of the state. *Manzanares v. Bell*, 214 Kan. 589, 599, 522 P.2d 1291 (1974)." *Aves*, 258 Kan. at 521. This analysis is similar to a rational basis test. See *Bonin*, 261 Kan. at 217-19. A statute passes the rational basis test if it "bears some reasonable relationship to a valid legislative objective." *Farley v. Engelken*, 241 Kan. 663, Syl. ¶ 3, 740 P.2d 1058 (1987).

The legislature enacted K.S.A. 65-442(b) to encourage hospitals to actively engage in the peer review of staff physicians, without the threat of liability from peer review. Peer review has the potential to lower malpractice incidents, thereby lowering malpractice insurance rates and encouraging doctors to practice in Kansas. Further, increased use of peer review should improve the overall quality of care provided in Kansas hospitals. Making sure that quality health care is available in the state is a valid legislative objective which promotes the general welfare of the people of the state. K.S.A. 65-442(b) and its abrogation of the corporate negligence remedy against hospitals is reasonably related to this valid legislative objective and is reasonably necessary to promote the general welfare of the people of the state. Thus, Step One of the § 18 test is satisfied.

Step Two of the § 18 test asks whether the legislature has provided an adequate substitute remedy or a quid pro quo for the abrogation of a common-law remedy. The plaintiffs contend that the quid pro quo requirement simply allows the legislature to shift the costs of the negligent activity of a tortfeasor from the tortfeasor to the most injured victims of the negligent activity. Thus, the plaintiffs assert that Step Two of the § 18 test, or the quid pro quo requirement, is unconstitutional in and of itself. This court has used the quid pro quo requirement for years in evaluating § 18 chal-

lenges. See *Bonin*, 261 Kan. at 217; *Aves*, 258 Kan. at 521; *Samsel v. Wheeler Transport Services, Inc.*, 246 Kan. 336, 358, 789 P.2d 541 (1990). We see no reason to reverse the precedent now.

Under Step Two of the § 18 test, the question is whether the legislature provided an adequate substitute remedy or quid pro quo to replace the remedy which has been modified or abrogated. Under 65-442(b), the legislature abrogated the plaintiffs' remedy to bring suit against a hospital for corporate negligence. Did the legislature provide an adequate substitute to replace this lost remedy?

The current version of K.S.A. 65-442(b) was enacted in 1976. L. 1976, ch. 267, § 1. It was enacted at the same time as the Health Care Provider Insurance Availability Act. Although not formally part of the Act, K.S.A. 65-442(b) is considered by commentators to be a part of the legislature's "package" enacted in response to the medical malpractice crisis of the 1970s. See Note, Recent Legislation: The Kansas Approach to Medical Malpractice, 16 Washburn L.J. 395, 406-07 (1977) (including K.S.A. 65-442(b) as a part of the discussion of the legislature's response to the medical malpractice crisis); see *State v. Bradley*, 215 Kan. 642, Syl. ¶ 5, 527 P.2d 988 (1974) (finding that statutes enacted at the same session, with the same effective date, should be read together according to the doctrine of *in pari materia*).

Prior to 1976, medical malpractice insurance rates began to rise in Kansas to such a degree that physicians claimed an inability to pay the rates and presented evidence that it affected the number of doctors willing to practice in Kansas. The legislature became worried about available health care in the state. Thus, the Kansas Legislature enacted the Act. The Act attempted to alleviate the insurance crisis of the 1970s so that it could ensure the continued availability of affordable medical malpractice insurance, and hence physicians, in the state. See *Aves*, 258 Kan. at 508.

K.S.A. 65-442(b) was included in the legislature's medical malpractice crisis "package" in an effort to encourage hospitals to actively engage in peer review of staff physicians. The legislature thought that hospitals might be hesitant to engage in peer review because if the hospital became aware, through peer review, of some mistakes a staff physician had made, but the hospital did not im-

mediately revoke the physician's staff privileges upon gaining knowledge of these mistakes, then this might open the hospital up to liability. To alleviate this fear, the legislature passed K.S.A. 65-442(b). With the threat of liability gone, the legislature hoped the use of peer review in hospitals would increase. See Minutes of the House Committee on Public Health & Welfare, Thursday, February 19, 1976.

When the Act was adopted in 1976, it "required licensed health care providers to obtain primary malpractice insurance as a condition precedent to practicing their profession in Kansas," with "at least $100,000 per occurrence coverage and not less than $300,000 annual aggregate coverage for all claims of primary medical malpractice insurance." *Aves*, 258 Kan. at 508. Consistent with its goal to make medical malpractice insurance available and affordable, so that physicians would continue to practice in the state,

> "[i]f a health care provider could not obtain primary malpractice insurance from a private insurance carrier, the Act provided health care providers with primary malpractice insurance through the Health Care Provider Insurance Availability Plan (the Plan). Thus, the health care provider could purchase primary malpractice insurance from a private insurance carrier or be placed in what amounted to an assigned risk pool in the Plan." 258 Kan. at 508-09.

The Act also required physicians to purchase mandatory excess medical malpractice insurance through the Health Care Stabilization Fund (Fund). In 1976, "the Fund paid all judgments which were beyond the policy limits of the health care provider's primary coverage." 258 Kan. at 509. In other words, the Fund had an unlimited liability limit and paid all malpractice awards beyond the health care provider's primary policy limit no matter how great. In 1976, the Act, the Plan, and the Fund guaranteed to all Kansas citizens that all health care providers in the state would have primary insurance coverage with at least a $100,000 policy limit plus unlimited excess malpractice insurance coverage. Thus, a medical malpractice victim was guaranteed to recover any judgment against a negligent health care provider. Without the Act, the Plan, and the Fund, victims of medical malpractice might not have received any recovery from a negligent health care provider if the provider was uninsured and judgment proof. 258 Kan. at 523-24.

The plaintiffs seem to admit that in 1976, the Act, with its required medical malpractice insurance; the Plan, with its guaranteed availability of primary medical malpractice insurance; and the Fund, with its unlimited excess liability coverage, was an adequate quid pro quo for the abrogation of their remedy against the hospital. However, the plaintiffs contend that this adequate quid pro quo has become emasculated due to amendments to the Fund. For instance, in 1984, while a health care provider's primary malpractice insurance policy limits were required to increase to at least $200,000 per occurrence and not less than $600,000 per annual aggregate for all claims under K.S.A. 40-3402, the Fund's excess liability coverage was capped at $3 million, so that it could only pay $3 million "on any judgment above the health care provider's primary policy in any one case." *Aves*, 258 Kan. at 509. Then, in 1989, the Fund was amended again. L. 1989, ch. 143, § 3. Health care providers became obligated to choose between three optional levels of Fund coverage: Option 1 provided for $100,000 per judgment in maximum Fund liability, for a total per judgment of $300,000 in liability coverage including the required primary policy of $200,000. Option 2 provided for $300,000 per judgment in maximum Fund liability for a total per judgment of $500,000 in liability coverage including the required primary policy of $200,000, and Option 3 provided for $800,000 per judgment in maximum Fund liability for a total per judgment of $1 million in liability coverage including the required primary policy of $200,000. The plaintiffs point out that the 1989 amendment to the Fund's excess insurance policy cap reduced their quid pro quo from $3.2 million required liability protection to $300,000 required liability protection in 1989.

Thus, the plaintiffs contend that the original quid pro quo provided in the Act, the Plan, and the Fund has been emasculated so much that it is no longer an adequate substitute remedy for the abrogation of the plaintiffs' remedy to sue a hospital for corporate negligence. As such, the plaintiffs assert that K.S.A. 65-442(b), which abrogates this remedy against the hospital, is an unconstitutional violation of § 18. In support of this argument, the plaintiffs cite to *Bair v. Peck*, 248 Kan. 824, 811 P.2d 1176 (1991), which provides:

"We recognize that there is a limit which the legislature may not exceed in altering the statutory remedy previously provided when a common-law remedy was statutorily abolished. The legislature, once having established a substitute remedy, cannot constitutionally proceed to emasculate the remedy, by amendments, to a point where it is no longer a viable and sufficient substitute remedy." 248 Kan. at 844.

*Bair* held that K.S.A. 1990 Supp. 40-3403(h), which abrogated a plaintiff's remedy to sue a hospital for vicarious liability and independent liability, did not violate § 18 because the legislature provided for an adequate quid pro quo in mandating primary malpractice insurance through the Act and in providing $3 million of excess malpractice insurance coverage through the Act and the Fund, even though this quid pro quo was originally enacted 10 years before K.S.A. 40-3403(h) was enacted and even though the quid pro quo was amended to include the $3 million cap 2 years before K.S.A. 40-4303(h) was enacted.

The defendant argues that the amendments to the Act and the Fund were simply a necessary part of enacting complicated and comprehensive legislation and do not qualify as an emasculation of a once adequate quid pro quo for the abrogation of the plaintiffs' corporate negligence remedy against a hospital. In support of this argument, the defendant cites to *Todd v. Kelly*, 251 Kan. 512, 837 P.2d 381 (1992), which explains why the legislature felt the $3 million cap on the Fund's excess liability coverage was necessary.

" 'With the adoption of the Health Care Provider Insurance Availability Act, all Kansas doctors were guaranteed the availability of malpractice insurance. Unfortunately, the crisis of medical malpractice insurance affordability continued, and intensified. See *Kansas Malpractice Victims Coalition v. Bell*, 243 Kan. at 337. See also *Bair v. Peck*, 248 Kan. 824, 828, 811 P.2d 1176 (1991). This affordability crisis was aggravated by the financial woes of the Health Care Stabilization Fund, which necessitated a substantial increase in the Fund surcharge which is assessed against Kansas health care providers. See *Kansas Malpractice Victims Coalition v. Bell*, 243 Kan. at 336.

" 'In response, the Kansas Legislature adopted a number of amendments to the Act during the 1984, 1985, and 1986 legislative sessions. Among these reforms were amendments to K.S.A. 1990 Supp. 40-3404, which were designed to place the Fund on an actuarially sound basis. Steps were also taken to reduce the Fund's "limits" of liability, in an attempt to make coverage more affordable. Originally the Act had provided for unlimited liability by the Fund. This unlimited exposure

made coverage too expensive, and also made it difficult to determine the appropriate Fund surcharge, based upon proper actuarial principles. Therefore, effective July 1, 1984, the legislature limited Fund liability to $3,000,000; in doing so, it was the clear intent of the legislature that Kansas physicians be assessed a Fund surcharge based upon a maximum exposure of $3,000,000.' " *Todd*, 251 Kan. at 517.

The defendants point out that the Act's requirement that all doctors have primary malpractice insurance and the Fund's guarantee of excess malpractice insurance coverage, despite the amendment which capped the Fund's liability at $3 million, was still enough of a quid pro quo to act as an adequate substitute remedy for the statutory abrogation of a hospital's vicarious (and independent) liability under K.S.A. 60-3404(h). *Bair,* 248 Kan. at 844.

However, the plaintiffs point out that, even since the 1984 amendment and the *Bair* decision, the Fund has been amended again. In 1989, the Fund was amended so doctors could have as little as $300,000 in total malpractice coverage. This, according to the plaintiffs, emasculates any quid pro quo that the Act and the Fund might have once provided with unlimited liability coverage for the doctor.

The defendants concede that the 1984 and the 1989 amendments to the Fund's liability cap do reduce the value of the quid pro quo which the plaintiffs were originally provided in 1976 when K.S.A. 65-442(b) statutorily abrogated their common-law remedy to sue a hospital for corporate negligence. However, the defendants contend that the legislative history makes it clear these amendments were necessary to assure the continuing effectiveness of the overall scheme. Otherwise, the legislature probably would have terminated the Fund and the requirement of mandatory liability insurance altogether. (See Minutes, Special Committee on Commercial & Financial Institutions, Sept. 14, 1988, Attachment of letter from executive director of Kansas Medical Society.)

In support of this argument, the defendants cite to *Bair,* 248 Kan. 824. The question in *Bair* was whether a quid pro quo, enacted in the 1976 Act and Fund, could be an adequate substitute remedy for the abrogation of a common-law remedy which occurred in 1986. Here, the question is whether the quid pro quo

provided in the 1976 Act and Fund, enacted at the same time that the remedy was abrogated, is still an adequate substitute remedy in light of the subsequent amendments the Act and Fund have undergone. Despite the factual differences in these two cases, the *Bair* court does offer insight into the legislature's power to amend comprehensive, complicated legislation. *Bair* provided:

"We have long recognized, at least tacitly, that major statutory enactments establishing a broad, comprehensive statutory remedy or scheme of reparation in derogation of a previously existing common-law remedy may be subsequently amended or altered without each such subsequent change being supported by an independent and separate quid pro quo. Provisions of the original Workmen's Compensation Act adopted in 1911 and upheld as constitutional in *Shade v. Cement Co.*, 92 Kan. 146, 139 Pac. 1193, *aff'd on rehearing* 93 Kan. 257, 144 Pac. 249 (1914), have been repeatedly amended without the adoption of an additional quid pro quo each time an amendment operated to the detriment of the employee. The original quid pro quo providing recovery for injury regardless of fault or negligence has been deemed sufficient to support dozens of amendments to the original act, many of which involved the abrogation of an existing common-law right.

. . . .

"In considering the adequacy of the quid pro quo of comprehensive legislation, which substitutes a statutory remedy for one that formerly existed at common law, and its sufficiency to support subsequent amendments or *modifications which diminish the substitute remedy originally granted*, no hard and fast rule can apply to all cases. It is obvious that the needs and goals of comprehensive legislation such as the Workers Compensation Act, the Kansas Automobile Injury Reparations Act, and the Health Care Provider Insurance Availability Act will change with the passage of time and the needs of a fluctuating society. It would take the wisdom of Solomon to devise comprehensive remedial legislation, such as that now before us, which would never need fine tuning, change, or modification. The Act is a piece of ongoing legislation which will, of necessity, require *continuous modification* to accomplish its goals.

. . . .

"At the time of the malpractice alleged by the plaintiff in this case, each individual health care provider who was alleged to be negligent was required to maintain $200,000 malpractice coverage and, in addition, the Fund provided $3,000,000 excess coverage for each tortfeasor. Without the Act, there would be no guarantee that a plaintiff injured because of the negligence of a health care provider could ever recover for his injuries, let alone have an assured fund available of $3,200,000. That is a sizeable quid pro quo, established by the Act, and certainly is an adequate substitute remedy for the common-law rights given up by injured malpractice victims. No argument is made that if the elimination of

the employer's vicarious liability had been a part of the original Act, the quid pro quo would somehow be insufficient. We conclude that in reviewing the sufficiency of the substitute remedy as it applies to amendment or modification of comprehensive remedial legislation, each determination must be made on a case-by-case basis. Recognizing that all such legislation may need periodic modification, we think the proper test to apply is whether the substitute remedy would have been sufficient if the modification had been a part of the original Act. If so, then no new or additional quid pro quo is necessary to support the modification against a Section 18 attack. Any other holding would require that every modification of a substitute remedy provided by comprehensive legislation that originally abrogated a common-law remedy would require a new and additional substitute remedy. As already noted, it would be virtually impossible to draft such legislation in a form that would anticipate all contingencies and which would not thereafter need change and modification." 248 Kan. at. 842-44.

*Bair* also cautioned:

"We recognize that there is a limit which the legislature may not exceed in altering the statutory remedy previously provided when a common-law remedy was statutorily abolished. The legislature, once having established a substitute remedy, cannot constitutionally proceed to emasculate the remedy, by amendments, to a point where it is no longer a viable and sufficient substitute remedy." 248 Kan. at 844.

This has not occurred here. Under the amended Act and Fund, medical malpractice victims are still guaranteed that their doctor will have $1 million in liability coverage available per judgment, should the doctor choose to be covered to such an extent, and the doctor is required to carry at least $300,000 in liability coverage. Absent the amended Act, many Kansas health care providers would not have any malpractice liability coverage, either because they could not qualify for it or could not afford it. Thus, the Act, the Plan, and the Fund still constitute an adequate quid pro quo for the abrogation of the plaintiffs' remedy to bring a corporate negligence action against a hospital, despite the amendments to the Act and Fund. This remedy has not been emasculated to a point where it is no longer a viable and sufficient substitute remedy. The defendants argue that this is especially true because the legislature has provided a supplemental quid pro quo for the abrogation of the corporate negligence remedy—the enactment of risk management statutes in 1986.

After 1976, the medical malpractice insurance crisis did not dramatically improve. See *Bair*, 248 Kan. at 828; *Kansas Malpractice Victims Coalition v. Bell*, 243 Kan. 333, 337, 757 P.2d 251 (1988). As a result of the continued crisis, during the 1984 and 1986 legislative sessions, the Kansas Legislature adopted a number of statutes designed to further increase the amount of risk management activity within Kansas hospitals. By these enactments, the legislature intended to increase the amount and quality of self-policing among health care professionals and, thereby, further reduce the frequency of medical malpractice incidents. It was hoped that such a reduction, when combined with reasonable tort reform, would alleviate the medical malpractice crisis. (Minutes, House Judiciary Comm., Jan. 13, 1986, Attachment of report of Legislative Research Depart.; Jan. 21, 1986, Attachment of report by Kan. Ins. Dept.)

The risk management statutes required each medical care facility to establish a risk management program, including a system for investigation regarding the frequency and causes of reportable incidents, measures to minimize the occurrence of reportable incidents, and a reporting system. K.S.A. 65-4922; K.S.A. 65-4923.

The defendants assert that these statutes, designed to increase the amount of risk management activity in Kansas hospitals, constitute a quid pro quo because the statutes should ideally result in the reduction of medical malpractice incidents and the general improvement of patient care. According to the defendants, these risk management requirements increase the likelihood that incompetent doctors will be weeded out of the system early, thereby preventing malpractice occurrences. With the reduction of medical malpractice incidents, medical malpractice insurance rates should fall and more doctors will be able to afford insurance and practice in Kansas, thereby improving the health and welfare of Kansas citizens. Thus, the defendants claim that the risk management statutes are an adequate quid pro quo for the abrogation of the plaintiffs' corporate negligence remedy, or at least an adequate supplemental quid pro quo, along with the amended Act and Fund.

The plaintiffs challenge this argument. The plaintiffs point out that 65-442(b) was adopted in 1976 but that the risk management

statutes were not enacted until 1986. L. 1976, ch. 267; L. 1986, ch. 229, §§ 3, 4.

It is true that K.S.A. 65-442(b), the statutory abrogation of the plaintiffs' remedy to sue a hospital for corporate negligence, was enacted in 1976, but that the alleged quid pro quo for such abrogation, required risk management under K.S.A. 65-4922 and 65-4923, was not enacted until 1986. However, this time-line does not necessarily destroy the defendants' quid pro quo argument. The defendants are not alleging that K.S.A. 65-4922 and 65-4923 were always the quid pro quo for K.S.A. 65-442(b) or the only quid pro quo for K.S.A. 65-442(b). Rather, the defendants contend that the original quid pro quo for 65-442(b), upon its enactment in 1976, was the Act, the Plan, and the Fund. The plaintiffs acknowledge that the Act, the Plan, and the Fund created an adequate quid pro quo at the time 65-442(b) was adopted. However, the plaintiffs allege that such quid pro quo has become emasculated due to the 1989 amendment that allowed a doctor to have as little as $300,000 in total malpractice coverage. In response, the defendants claim the risk management statutes (K.S.A. 65-4922 and 65-4923), enacted in 1986, constitute a supplemental quid pro quo which buttress the quid pro quo provided in the Act, the Plan, and the Fund upon the Fund's amendment in 1989. We agree.

The legislature has the right to modify and supplement a quid pro quo, especially in the area of a complicated, comprehensive statutory scheme. The plaintiffs' common-law remedy to sue a hospital for corporate negligence was taken away with the enactment of 65-442(b) in 1976. At this time, the plaintiffs received an adequate quid pro quo in the Act, the Plan, and the Fund. However, this quid pro quo was greatly reduced, although not emasculated, through the 1989 amendments to the Fund. Yet, 3 years prior to this amendment, in 1986, the plaintiffs received a new supplemental quid pro quo that they did not have before—a requirement that hospitals engage in risk management to ensure that all incompetent physicians are discovered and denied staff privileges. With these statutes, the very purpose of the corporate negligence cause of action is fulfilled. Hospitals are on the lookout for incompetent physicians, even though they were not subject to liability for their

actions. Further, these risk management requirements ideally cause medical malpractice incidents to decrease, thereby reducing insurance rates. Thus, more doctors should be able to afford insurance in Kansas and will practice in Kansas. As a result, Kansas citizens will have available health care to insure their health and welfare. Thus, the Act, the Plan, and the Fund, as amended, supplemented by the risk management statutes, create an adequate quid pro quo for the abrogation of the plaintiffs' corporate negligence remedy.

In summary, this court struggles with the bottom line figure as to how much a quid pro quo can be amended and still remain an adequate quid pro quo. As in *Bair*, 248 Kan. at 844, this court realizes that an original quid pro quo cannot be emasculated to a point where it is no longer a viable and sufficient substitute remedy. Here, the legislature did *not* emasculate the quid pro quo provided in the Act, the Plan, and the Fund, through the 1989 amendments, to a point where it was no longer an adequate substitute remedy, even when standing alone, without the supplemental quid pro quo provided in the risk management statutes. Under the amended Fund, the minimum amount of medical malpractice insurance the doctor is now required to carry is $300,000. If they can prove negligence, the plaintiffs will recover at least $300,000. Without the Act and the Fund, the doctor might not have been insured at all and the plaintiffs might have recovered nothing. In a medical malpractice case, the doctor has his or her personal fortune at stake if adequate insurance is not purchased. It is basically the doctor who has little to risk who carries the minimum insurance. The public is benefitted by any insurance that is carried by that doctor. This is, and should be to some extent, a legislative call and we are unable to say that requiring $300,000 minimum to be available in every case is so inadequate that it is an inadequate quid pro quo. The plaintiffs herein will personally receive the benefit of the portion of the original quid pro quo that remains—required primary medical malpractice insurance and guaranteed excess medical malpractice insurance. Further, all plaintiffs will generally receive the benefit of the supplemental quid pro quo—risk management requirements that protect patients from incompetent doctors.

Thus, the legislature has provided an adequate quid pro quo for the statutory abrogation of the plaintiffs' common-law remedy to sue a hospital for corporate negligence. The second step of the § 18 test has been satisfied.

The parts of the certified question are answered as follows:

I.   Does K.S.A. 65-442(b) or K.S.A. 40-3403(h), as interpreted in the case of *McVay v. Rich*, 255 Kan. 371, 874 P.2d 641 (1994), violate either § 1 or § 18 of the Kansas Constitution Bill of Rights?

   A.   Does K.S.A. 65-442(b) violate § 1? The plaintiffs waived this issue here and in federal court, so this question was not addressed.

   B.   Does K.S.A. 65-442(b) violate § 18? No.

   C.   Does K.S.A. 40-3403(h) violate § 1? No.

   D.   Does K.S.A. 40-3403(h) violate § 18? No.