(28 P.3d 420)
No. 84,978

JAMES M. DONNELL, M.D., *Appellant*, v. HCA HEALTH SERVICES OF KANSAS, INC., d/b/a WESLEY MEDICAL CENTER, WESLEY INTEGRATED HEALTH GROUP, and ROLLAND K. ENOCH, M.D., *Appellees*.

Opinion filed July 6, 2001.

*Jon S. Womack*, of Wichita, for the appellant.

*John H. Gibson* and *Michelle M. Watson*, of Boyer, Donaldson & Stewart, L.L.P., of Wichita, for the appellee.

Before GERNON, P.J., LEWIS, J., and ROGG, S.J.

LEWIS, J.: Dr. James M. Donnell had been employed by HCA Health Services of Kansas, Inc., (HCA) for many years. He, along with a group of other physicians, served as a member of a steering committee whose purpose it was to help write the employment contracts between the physicians and HCA. The group of family practice physicians was formed in order that HCA might compete with other hospitals in the Wichita area which already had established clinics. We take it that Dr. Donnell served well and with distinction in his role on the committee and as a physician for a number of years.

It appears that the problems which culminated in Dr. Donnell's termination began with a patient by the name of Golda Marie Long. This patient had been observed and treated in the emergency room at Wesley Medical Center (Wesley). When Dr. Donnell saw her later, he diagnosed her condition as pancreatitis. This diagnosis was consistent with that made by the emergency room physicians. After making the diagnosis, he ordered, among other things, a CT scan. The CT scan revealed that the patient was suffering from an esophageal perforation. This was considered to be a serious medical situation which required immediate attention. The testimony as to whether Dr. Donnell was verbally advised of the results of the CT scan is disputed.

Dr. Donnell referred the patient to Dr. Waswick, a surgeon. The surgeon performed surgery on Long to repair the rupture, but her condition deteriorated, and, approximately 2 weeks later, she died.

Apparently every death in the hospital is reviewed by the executive committee of the Wesley staff. Such review was conducted after Long's death. The procedures provided for carrying out peer review, physician corrective action, and discipline are contained in Wesley's staff bylaws and in the corrective action and fair hearing

plan manual. The chairman of the committee, which was given the obligation to investigate the death, was defendant Dr. Rolland K. Enoch. The risk manager, Carla Walker, assisted in the investigation. Walker presented her findings to Dr. Enoch and the committee. After they received the findings of the risk manager, Dr. Donnell was invited to come to a committee meeting to discuss the concerns the committee had about his treatment of the patient.

Dr. Donnell attended the next committee meeting and, according to him, only two questions were asked of him and he was given approximately 15 minutes before the committee. After the meeting, the committee decided that Dr. Donnell's actions amounted to a "Level 4" violation of the standard of care of a patient, and the committee decided that a review should be undertaken of all of Dr. Donnell's medical charts to see if any pattern could be identified similar to the Long case.

Apparently, Dr. Enoch conducted his own investigation and reported on the results of that to the committee. He expressed concern about Dr. Donnell's inability to immediately respond to the emergency situation revealed in the patient's condition. At the same time, Dr. Enoch admitted that he did not know whether Dr. Donnell had been told about the esophageal perforation, which was the condition which led to Long's death. Dr. Enoch did not interview any of the other physicians involved in Long's case. He indicated that his investigation consisted of information provided by the risk management personnel in determining whether Dr. Donnell provided adequate health care to the patient.

As noted above, Dr. Donnell's medical records were examined, and there were concerns expressed about his record-keeping practices. However, the doctor was apparently never notified that his record-keeping practices were considered deficient.

There was an investigation into Long's death by the Medicaid/MediKan Foundation. The Foundation concluded that Long's death probably would have occurred even if Dr. Donnell had acted differently. The report concluded there were internal communication problems which existed in the circumstances surrounding Long's death.

Ultimately, a second peer review procedure was held, and Dr. Donnell's staff privileges with Wesley were suspended. Dr. Donnell was advised that his employment contract with HCA would be terminated because his staff privileges with Wesley had been suspended due to deficiencies in handling the Long case. At the time of his suspension, Dr. Donnell was requested to obtain psychological and neurological evaluations but was not told he was considered impaired or that anyone thought he was impaired.

Dr. Donnell then obtained a psychological evaluation from Dr. Fred DeWitt and a neuropsychological evaluation from Dr. Mitchel Woltersdorf. The reports obtained indicated he was functioning at a superior range of intelligence and was fit to practice medicine. However, Dr. Donnell failed to obtain the neurological exam by the physician which had been specified by the peer review committee.

After reviewing the reports from the physicians whom Dr. Donnell had consulted, the committee continued his suspension because he failed to get the requested neurological examination.

Dr. Donnell appealed from the continuation of his emergency suspension, and a second hearing was held. After the second hearing was concluded, the committee voted to continue the suspension, and Dr. Donnell's employment remained suspended.

The next step was the filing of the instant action that is now being considered by this court on appeal. In this action, among other things, Dr. Donnell alleges that Dr. Enoch was negligent in investigating the claims which ultimately resulted in the suspension of Dr. Donnell's medical staff privileges.

Shortly after the action was filed, Dr. Donnell filed a motion to amend the pleadings to include a claim for punitive damages and a motion to add tort claims to the petition. The tort claims to be added included tortious interference with a business relationship, fraud, slander, and libel. He also contended that the evidence would show wanton misconduct on the part of Dr. Enoch and Wesley in the peer review process, which would support his claim for punitive damages. The trial court granted the motions to amend.

After discovery had been completed, all the defendants filed a motion for summary judgment. The trial court found there were no controverted facts, only "different spins on the same set of facts."

In ruling on the summary judgment motion, the trial court considered whether Dr. Donnell would be required to produce expert testimony regarding negligence in the peer review process. The trial court concluded that the standard involved in that allegation was ordinary care, and no expert was required. The court also found that for the purposes of summary judgment, it would accept as true that the peer review was conducted in a "sloppy" or "grossly negligent" manner as alleged by Dr. Donnell.

The trial court granted summary judgment in favor of the defendants, holding that the contract had been terminated for just cause. It also concluded that the defendants were clothed with immunity from liability in an action of this nature in the absence of proof that they acted maliciously and in bad faith. The court went on to conclude that both Wesley and Dr. Enoch were protected by immunity from liability for damages.

Wesley and Dr. Enoch cross-appeal the court's denial of summary judgment on the question of whether Dr. Donnell was to produce expert testimony in order to support his claim of negligence in the peer review process. Dr. Donnell appeals from the entry of summary judgment in favor of the defendants.

Our standard of review in a case where summary judgment is granted is well known:

"Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must

be denied. [Citation omitted.]" *Bergstrom v. Noah,* 266 Kan. 847, 871-72, 974 P.2d 531 (1999).

We also point out that "[a] party opposing a [motion for] summary judgment may not rest merely on allegations, but must provide some affirmative evidence to supports its position. K.S.A. 1998 Supp. 60-256(e)." *Bi-State Dev. Co., Inc. v. Shafer, Kline & Warren, Inc.,* 26 Kan. App. 2d 515, 517, 990 P.2d 159 (1999).

There are a number of issues raised on appeal.

## DID THE TRIAL COURT ERR IN FINDING THE FACTS WERE NOT CONTROVERTED?

Dr. Donnell argues there are material controverted issues of fact which still exist and that the trial court erred in granting summary judgment to the defendants. We disagree and affirm the trial court's decision in that regard.

It appears the trial court rather carefully edited the facts to come up with an appropriate statement of uncontroverted facts. The editing by the trial court consisted of word changes, additions, or issues that did not affect the outcome of the case before the court. For example, Dr. Donnell argues it was a controverted question of fact whether he knew about the results of the CT scan in the Long case. That could very well be true, but it is not a critical or a material question of fact in the instant matter. The question in this case is how the defendants handled the peer review investigation and eventual termination of employment. Any factual controversy surrounding Dr. Donnell's handling of the Long case is simply not material to the issues on which this action needs to be decided.

Additionally, Dr. Donnell contends there was a material issue of fact as to whether the peer review proceedings were conducted appropriately. Once again, we do not agree. The court accepted as true, for the purposes of deciding the summary judgment motion, the allegations of Dr. Donnell that the peer review was done in a sloppy, negligent manner. Even making this assumption, Dr. Donnell does not contend, nor were there facts to show, that the defendants were guilty of bad faith or malice in conducting the peer review proceedings. As a result, those facts are not material to the issues in this action.

We hold the trial court was correct in determining that the material issues of fact in this case were, in fact, uncontroverted. The trial court further reviewed those facts in the light most favorable to Dr. Donnell, which is in accordance with the law.

## WERE THE DEFENDANTS IMMUNE FROM LIABILITY UNDER THE PROVISIONS OF FEDERAL AND STATE LAW?

The real issue in this action is not how Dr. Donnell may or may not have treated patient Long. The question is whether the defendants in this case are immune from liability for damages in a civil action. The trial court concluded they were immune from liability under both state and federal statutes and, as a result, granted the defendants' motion for summary judgment. We agree with the trial court's decision.

The federal act which governs immunity under these circumstances is 42 U.S.C. § 11111 *et seq.* (1994), and is known as the "Health Care Quality Improvement Act" and we shall refer to it as HCQIA. Congress enacted HCQIA to improve the quality of health care and to reduce the number of incompetent physicians through effective peer review. 42 U.S.C. § 11101 (1994). The HCQIA eliminates deterrents to effective peer review by granting to groups conducting that review immunity from suit. 42 U.S.A. § 11111(a)(1) (1994). Under the federal statutes, so long as the peer review group provides adequate due process to the physician in question and so long as the action is taken with a reasonable belief that it will further quality health care, the peer group conducting a review is entitled to immunity. 42 U.S.C. § 11112 (1994).

While we conclude there would be immunity for the defendants under the federal enactment, we do not believe that enactment applies to the instant matter. Our decision will be based upon Kansas statutes, which we believe take precedence under the circumstances shown in this action.

K.S.A. 65-442 grants immunity in peer review processes in an effort to "encourage hospitals to actively engage in peer review of staff physicians." *Lemuz v. Fieser*, 261 Kan. 936, 950, 933 P.2d 134 (1997). This legislation was enacted under the belief that with the threat of liability removed, the effective use of peer review would

increase and be promoted. 261 Kan. at 951. Under Kansas law, immunity exists as long as the actions by the peer review group were taken in good faith and without malice. *Smith v. Farha,* 266 Kan. 991, 994, 974 P.2d 563 (1999).

K.S.A. 65-442 states:

"(a) There shall be no liability on the part of, and no action for damages shall arise against, any duly appointed member of the governing board or the duly appointed member of a committee of the medical staff of a licensed medical care facility for any act, statement or proceeding undertaken or performed within the scope of the functions and within the course of the performance of the duties of such committee of the medical staff if such member acted in good faith and without malice, and the medical staff operates pursuant to written bylaws that have been approved by the governing board of the medical care facility.

"(b) There shall be no liability on the part of and no action for damages shall arise against any licensed medical care facility because of the rendering of or failure to render professional services within such medical care facility by a person licensed to practice medicine and surgery if such person is not an employee or agent of such medical care facility."

The protection for good faith participation in the peer review process also exists in K.S.A. 65-2898(b) and K.S.A. 65-4909(a). K.S.A. 65-2898(b) states:

"(b) Any state, regional or local association composed of persons licensed to practice a branch of the healing arts and the individual members of any committee thereof, which in good faith investigates or communicates information pertaining to the alleged incidents of malpractice, or the qualifications, fitness or character of, or disciplinary action taken against, any licensee, registrant or certificate holder to the state board of healing arts or to any committee or agent thereof, shall be immune from liability in any civil action, that is based upon such investigation or transmittal of information if the investigation and communication was made in good faith and did not represent as true any matter not reasonably believed to be true."

Similarly, K.S.A. 65-4909(a) provides:

"(a) There shall be no liability on the part of and no action for damages shall arise against any: (1) State, regional or local association of health care providers; (2) state, regional or local association of licensed adult care home administrators; (3) organization delegated review functions by law, and the individual members of any committee thereof (whether or not such individual members are health care providers or licensed adult care home administrators); or (4) individual or entity acting at the request of any committee, association or organization listed in subsections (1) through (3), which in good faith investigates or communicates

information regarding the quality, quantity or cost of care being given patients by health care providers . . . for any act, statement or proceeding undertaken or performed within the scope of the functions and within the course of the performance of the duties of any such association, organization or committee if such association, organization or committee or such individual member thereof acted in good faith and without malice."

We conclude, without question, that these statutes apply to the instant matter and that they are a clear indication that public policy, both state and federal, protects individuals and groups involved in the peer review process by providing qualified immunity when that process is conducted in good faith and without malice. The immunity under the facts shown applies to Wesley and to Dr. Enoch because their actions were in good faith, without malice, and they did not represent as true any matter which they did not reasonably believe to be true. The net result is that these defendants were immune from liability, and the trial court did not err in granting them summary judgment.

Dr. Donnell continues to argue that the defendants were sloppy and negligent in the manner in which they conducted the review in this case. Those allegations may very well be true, and in fact the trial court assumed those facts to be true in reaching its decision. The problem from Dr. Donnell's standpoint is that these defendants are immune under state law from liability even if they were sloppy, even if they were negligent, and, indeed, even if their conclusions were wrong. Dr. Donnell would be successful in recovering damages from these defendants only by showing that the defendants acted in bad faith and with malice. As near as we can determine, Dr. Donnell does not even contend that the defendants acted in bad faith and with malice, and there is absolutely no evidence in the record which would indicate that the defendants acted in bad faith and maliciously. Accordingly, the defendants were immune from liability, and the trial court did not err in granting summary judgment in favor of the defendants.

Dr. Donnell argued that his claim for punitive damages was based on a theory of "wanton" conduct and that the issue of malice was also premised on a theory of economic motives for his termination. Once again, we agree that his argument may very well be

true. His problem again is that the allegation of bad faith was never backed up with specific evidence. The trial court correctly concluded there was no factual dispute as to the lack of bad faith and malice and, as a result, immunity applied. We conclude that in this action, summary judgment was appropriate.

The only issue remaining on appeal is the issue cross-appealed by the defendants as to whether Dr. Donnell would need expert testimony to survive a motion for summary judgment on an action against the defendants for negligence. Since we have affirmed the decision of the trial court in granting summary judgment to the defendants, the cross-appeal is rendered moot, and we do not reach that issue.

Affirmed.