Luckert, J., dissenting:
I dissent from the majority's holding that the cap on noneconomic damages set in K.S.A. 60-19a02 violates the right to a jury trial as protected by section 5 of the Kansas Constitution Bill of Rights. Unlike the majority, I would follow Miller v. Johnson , 295 Kan. 636, 289 P.3d 1098 (2012), which applied the so-called quid pro quo test to determine K.S.A. 60-19a02 did not violate a medical malpractice plaintiff's rights under section 5. Applying that same test and the rationale of Miller to Diana Hilburn's claim of damages against a motor carrier and its driver, I conclude: (1) the various statutes and regulations mandating motor carrier liability insurance and K.S.A. 60-19a02 are reasonably necessary in the public interest to promote the public welfare; and (2) the Legislature has substituted an adequate statutory remedy for Hilburn's right to have a jury determine her damages. These two conclusions satisfy the quid pro quo test, meaning K.S.A. 60-19a02 does not violate Hilburn's rights under either section 5 or section 18 of the Kansas Constitution Bill of Rights.
Two threshold considerations require discussion before I reach the quid pro quo analysis, however. First, contrary to the majority's conclusion, Hilburn did not preserve for this court's review the issue of whether the quid pro quo test should not be applied to a section 5 analysis. Our analysis thus should begin where Hilburn started her argument before the district court. Citing Miller , she argued it is distinguishable. As I will discuss in more detail, I conclude it is not. Second, I disagree with the majority's decision to overturn Miller and other decisions that apply the quid pro quo test for deciding whether statutes limiting the right to a jury violate the Constitution. Overturning precedent runs against the doctrine of stare decisis, especially when Kansans have relied on the law when writing, negotiating, and agreeing to insurance, indemnity, and other contracts.
1. Hilburn did not preserve the issue of whether the quid pro quo test applies.
The majority concluded that Hilburn preserved the issue of whether the quid pro quo test applies to a section 5 analysis. I disagree because Hilburn did not present the issue to the district court, the Court of Appeals did not decide it, and Hilburn did not identify it as an issue in her petition for review. Thus, contrary to the majority's holding, Hilburn failed to preserve the issue for our review. (In this context, I refer to both the three-justice plurality and the concurring opinion as the majority. The plurality concludes Hilburn preserved this question. Op. at 512-13. The concurring opinion does not discuss the point but implicitly adopts that holding by joining the portion of the plurality that "reverse[s] the so-called 'quid pro quo' test as applied in the context of a section 5 challenge under the Kansas Constitution." Op. at 524.)
In the district court, Hilburn acknowledged this court's decision in Miller and its holding that the quid pro quo test applied to section 5 challenges. Rather than argue a different test applied, she sought to distinguish Miller from her situation. In doing so, she pointed out that Miller 's result hinged on the Health Care Provider Insurance Availability Act's, K.S.A. 40-3401 et seq., requirement that all medical providers have malpractice insurance coverage up to specified limits. The Miller court held that the existence of an insurance mandate guarantees a plaintiff will recover some amount of damages, and that guarantee, assured by Kansas statutes, provides an adequate quid pro quo. The cap on noneconomic damages was therefore constitutional as applied to a medical malpractice plaintiff. See Miller , 295 Kan. at 659-65, 289 P.3d 1098. Hilburn argued there was no similar quid pro quo in her case because "the requirement of mandatory insurance *532 for semi trucks is not Kansas law, rather it's federal law."
The district court rejected Hilburn's argument, concluding her attempt to distinguish Miller rested on "a distinction without a difference." The district court thus held that Miller "applies here as well and that the legislature also equally has the right to limit noneconomic damages because they require and modify a common law obligation that did not exist regarding mandatory automobile insurance." Neither Hilburn nor the district court questioned whether Miller employed the correct test. Thus, the issue was not raised in the district court.
That procedural history leads to Hilburn's first preservation obstacle. A party usually cannot argue an issue on appeal that the party did not raise in district court. Exceptions exist, but the party must argue why an exception applies before we will consider the issue. See, e.g., State v. Thach , 305 Kan. 72, 81, 378 P.3d 522 (2016) ; see also Supreme Court Rule 6.02(a)(5) (2019 Kan. S. Ct. R. 35) ("If the issue was not raised below, there must be an explanation why the issue is properly before the court."). Hilburn made no attempt to argue one of the exceptions applied. She has thus failed to preserve this question.
For the purposes of our discretionary review of the panel's decision at Hilburn's request she faces a different preservation issue, this time related to her arguments before the Court of Appeals. There, she specifically argued this court should not have applied the quid pro quo test in Miller or any other situation in which legislation encroached on the jury trial right under section 5. But the Court of Appeals panel, apparently overlooking Hilburn's failure to preserve the issue in the district court, quickly disposed of this argument, noting it "is duty bound to follow Supreme Court precedent absent some indication that the court is abandoning its prior position." Hilburn v. Enerpipe, Ltd. , 52 Kan. App. 2d 546, 554, 370 P.3d 428 (2017) (citing Farley v. Above Par Transportation , 50 Kan. App. 2d 866, 877, 334 P.3d 883 [2014], rev. denied 302 Kan. 1009 [2015]). The panel thus "use[d] the quid pro quo test when considering the constitutionality of K.S.A. 60-19a02 as applied to Hilburn." 52 Kan. App. 2d at 544, 371 P.3d 923. Consequently, the panel did not reach any conclusion about whether this court had correctly decided Miller . Instead, applying the quid pro quo test, the panel affirmed the district court. At one point, it summarized its reasoning:
"[T]he Supreme Court [in Miller ] relied on the insurance scheme established in the Health Care Provider Insurance Availability Act, an act that does not apply to other torts. Because the State has established a similar insurance scheme for injuries caused by the negligence of motor carriers and automobile drivers, we find the rationale of the Miller court controls our decision in this case." 52 Kan. App. 2d at 548, 370 P.3d 428.
Hilburn petitioned for our review of this holding, raising four issues. All four relate to the panel's analysis of whether the insurance requirements in motor carrier regulations and the Kansas Automobile Injury Reparations Act (KAIRA), K.S.A. 40-3101 et seq., supply an adequate substitute remedy for the cap's encroachment on her section 5 rights. None mentioned whether the panel applied the appropriate test. Not until after this court granted review did Hilburn file a supplemental brief advancing arguments about whether the quid pro quo analysis has a place in section 5 jurisprudence and, if not, what test should apply in its stead. Hilburn waited too long to raise the issue.
When Hilburn filed her petition for review, our rules required:
"(C) A statement of the issues decided by the Court of Appeals of which review is sought . The court will not consider issues not presented or fairly included in the petition. The court, however, may address a plain error not presented. In a civil case, the petitioner also must list, separately and without argument, additional issues decided by the district court which were presented to, but not decided by, the Court of Appeals, which the petitioner wishes to have determined if review is granted. " (Emphases added.) Kansas *533 Supreme Court Rule 8.03(a)(4)(C) (2015 Kan. Ct. R. Annot. 79).
A party thus must list an issue it wants this court to reach. Then, and only then, is the issue properly preserved. And only if properly preserved does the exception relied on by the majority- Rule 8.03(h)(1) -come into play. That exception states: "In civil cases, the Supreme Court may, but need not, consider other issues that were presented to the Court of Appeals and that the parties have preserved for review ." (Emphasis added.) Rule 8.03(h)(1) (2015 Kan. Ct. R. Annot. 81). We recently discussed this preservation rule in Castleberry v. DeBrot , 308 Kan. 791, 796, 424 P.3d 495 (2018).
There, we held a petitioner must list any issue not decided by the Court of Appeals that the petitioner wants this court to consider. Otherwise, the petitioner fails to preserve the issue in a way that allows us to exercise our discretion to consider the issue. We explained that the discretion granted by (h)(1) "ties to Rule 8.03(a)(4)(C), which requires parties to identify and separately list any issues presented to-but not decided by-the Court of Appeals that the party believes the Supreme Court should consider in its review." 308 Kan. at 796, 424 P.3d 495. We reminded litigants that " Rule 8.03(h)(1) is not a stealth mechanism to excuse the specificity required by Rule 8.03(a)(4) and our other rules controlling the review process." 308 Kan. at 796, 424 P.3d 495.
Despite Rule 8.03(a)(4), Hilburn did not list the issue. Yet the majority attempts to untether the provisions without explaining why Castleberry was erroneous or, alternatively, why Castleberry does not apply.
Instead, the majority relies on the plain error exception in Rule 8.03(a)(4)(C). I can find no case discussing this exception or how to apply it. And the majority cites none. But, in context, I read the provision to require that the district court or the Court of Appeals panel-not this court-to have committed plain error. But neither the district court nor the Court of Appeals panel committed plain error when they applied Miller . As noted, both courts recognized they had to follow Miller . Their conclusion is correct under settled caselaw. See Rhoten v. Dickson , 290 Kan. 92, 112, 223 P.3d 786 (2010). Today's majority does not suggest otherwise. Instead, the majority holds this court erred in Miller . Rule 8.03(h)(1) -a rule about this court's review of a Court of Appeals decision-does not open the door for us to revisit one of our prior decisions unless a party preserves the issue. Hilburn did not.
I thus would hold that Hilburn has not preserved the issue of whether a test other than quid pro quo should apply. This court should thus apply the quid pro quo test to Hilburn's assertion that the noneconomic damage cap violates her right to a jury trial under section 5 of the Kansas Constitution Bill of Rights.
2. The doctrine of stare decisis instructs us to apply Miller.
After stretching our rules to reach whether Miller 's application of the quid pro quo analysis to section 5 should be reversed, the plurality concludes the doctrine of stare decisis does not dictate we apply Miller . Op. at 517-19. Two members of today's plurality took that same position in their dissent in Miller . For the most part, those justices repeat that analysis today.
The Miller majority explained why the stare decisis doctrine applied when we decided Miller and nothing has altered the validity of that explanation:
"The doctrine of stare decisis maintains that once a point of law has been established by a court, it will generally be followed by the same court and all courts of lower rank in subsequent cases when the same legal issue is raised. A court of last resort will follow that rule of law unless clearly convinced it was originally erroneous or is no longer sound because of changing conditions and that more good than harm will come by departing from precedent. Rhoten v. Dickson , 290 Kan. 92, 112, 223 P.3d 786 (2010). Stare decisis ' " 'promote[s] system-wide stability and continuity by ensuring the survival of decisions that have been previously approved by a court.' " ' Crist v. Hunan Palace, Inc. , 277 Kan. 706, 715, 89 P.3d 573 (2004) (quoting [
*534 Samsel v. Wheeler TransportServices, Inc ., 246 Kan. 336, 356, 789 P.2d 541 (1990) [ Samsel II ) ] ) 'Judicial adherence to constitutional precedent ensures that all branches of government, including the judicial branch, are bound by law.' Samsel II , 246 Kan. at 356 [789 P.2d 541].
"A quid pro quo analysis in Section 5 challenges to the legislature's limitations on recovery for personal injuries has been employed by this court in varied contexts, including workers compensation ( Rajala [v. Doresky , 233 Kan. 440, 661 P.2d 1251 (1983) ] ), no-fault automobile insurance coverage ( Manzanares [v. Bell , 214 Kan. 589, 522 P.2d 1291 (1974) ] ), medical malpractice ( Kansas Medical Malpractice Victims [Coalition v. Bell , 243 Kan. 333, 757 P.2d 251 (1988) ] ), and general tort litigation ( Samsel II ). To retreat from that analysis now, our court would have to overrule those cases and embark on a new analytical model that would collaterally create uncertainty about the constitutionality of the Workers Compensation Act, which has been upheld since our 1914 decision in Shade , and what is now known as the Kansas Automobile Injury Reparations Act, upheld since our 1974 decision in Manzanares . See Samsel II , 246 Kan. at 361 [789 P.2d 541].
"In addition, there is a link between Section 5 and Section 18 issues in a damages case such as this, so it seems logical when dealing with statutory caps to have Section 5 and Section 18 encroachments measured against the same standard as has been done in our prior caselaw. As discussed in greater detail below, our caselaw dealing with Section 18 right-to-remedy issues is well entrenched using a quid pro quo analysis and it simply makes sense to have the same analytical model for Section 5. After all, noneconomic damages are a subset of compensatory damages; therefore, the statutory cap impacts a plaintiff's compensatory damages, which is a category of remedy at common law protected by Section 18. Smith v. Printup , 254 Kan. 315, 325, 866 P.2d 985 (1993). Moreover, the quid pro quo model readily allows the legislature to understand that it must provide an adequate and viable substitute when modifying a common-law jury trial right under Section 5 or right to remedy under Section 18.
"Accordingly, we are not clearly convinced use of the quid pro quo model was originally erroneous or is no longer sound because of changing conditions, or that more good than harm would come by departing from this precedent. See Rhoten , 290 Kan. at 112 [223 P.3d 786]. And while our court has come to different outcomes after employing the quid pro quo analysis in Section 5 challenges, this does not detract from its viability as an analytical model to determine such challenges. See Bair v. Peck , 248 Kan. 824, 844, 811 P.2d 1176 (1991) (Adequacy of the substitute remedy as it applies to comprehensive remedial legislation must be made on a case-by-case basis.); Lemuz v. Fieser , 261 Kan. 936, Syl. ¶ 6, 933 P.2d 134 (1997) (In considering the adequacy of the quid pro quo of comprehensive legislation that substitutes a statutory remedy for one that formerly existed at common law, 'no hard and fast rule can apply to all cases.').
"We hold that a quid pro quo analysis is appropriate for determining [Amy] Miller's Section 5 right-to-jury trial claims against K.S.A. 60-19a02." Miller , 295 Kan. at 653-55, 289 P.3d 1098.
Today, a majority of this court rejects these reasons for applying the stare decisis doctrine. I am no more persuaded by the majority's position today than I was when two members of the plurality expressed their view when dissenting from Miller . That said, for me, the stare decisis doctrine plays a compelling and determinative role in my position, just as it did when the court decided Miller . In my view, the majority downplays the consequences of overruling Miller . The majority's decision today upends caselaw addressing jury trial limitations imposed in workers compensation, medical malpractice, no fault insurance, and general tort litigation. If nothing else, Kansans have written, negotiated, and executed innumerable insurance policies and indemnity contracts relying on the limitations of the damages caps. As we have recognized, " '[c]onsiderations in favor of stare decisis are at their acme in cases involving property and contract rights, where *535 reliance interests are involved.' " Crist v. Hunan Palace, Inc ., 277 Kan. 706, 715, 89 P.3d 573 (2004) (quoting Payne v. Tennessee , 501 U.S. 808, 828, 111 S. Ct. 2597, 115 L. Ed. 2d 720 [1991] ). Thus, we have generally declined to overrule precedent that would undercut the reliance placed on our past decisions when writing, issuing, and buying policies for such things as automobile insurance. See 277 Kan. at 715, 89 P.3d 573. The majority gives little heed to the consequences of changing the rules that underlie these contracts. In doing so, it creates instability. In turn, it undercuts the stare decisis principles on which our system of the rule of law depends.
In part, today's majority does so by taking the view that the Miller majority misread the caselaw holding the workers compensation system did not infringe on section 5 rights. Today's majority concludes the analysis in these cases was based on consent, not the quid pro quo test. The Miller majority discussed this argument at some length:
"This view, however, can be criticized as an oversimplification of the [workers compensation] statute. The opt-out provision in the original workers compensation law was entirely passive in nature, and its effect was not based on a knowing and voluntary waiver or affirmative consent. Instead, the law upheld in Shade [v. Cement Co. , 93 Kan. 257, 260, 144 P. 249 (1914) ] abolished an injured worker's 'inviolate' right to a jury trial as stated in Section 5 even though the worker had done nothing to accept the benefits under the statute or forego his or her constitutional right to a jury trial. The statute simply took away this inviolate right unless the worker performed an intentional act to preserve it by opting out of the statutory provisions. Thus, the Shade decision's influence on any Section 5 analysis cannot be as easily discarded as the dissent argues.
"Regardless, the opt-out provision was removed in 1974, making the system mandatory for both employees and employers. L. 1974, ch. 204, sec. 8 (amending K.S.A. 44-505 ). And our more recent decisions emphasize that the Workers Compensation Act constitutionally balances the interests of employees and employers-a balance described as an adequate quid pro quo." 295 Kan. at 649-50, 289 P.3d 1098.
Today's majority rejects this discussion because these later cases involved a section 18, rather than a section 5, challenge. This misses the point that a quid pro quo analysis would-and has-served as a basis for upholding the constitutionality of the Workers Compensation Act, even if on section 18 grounds. And because until today this court has analyzed section 18 and section 5 under the same test, the section 18 caselaw implicitly foreclosed a section 5 attack. But no longer. Today's majority leaves shaky ground in many areas of law that had long been firmly settled.
In such circumstances, the doctrine of stare decisis instructs us to follow precedent. And that is what I would do.
3. Mandatory motor carrier liability insurance provides an adequate substitute remedy for the rights K.S.A. 60-19a02 curtails.
I agree with the majority on one point: "[T]he determination of noneconomic damages was a fundamental part of a jury trial at common law and protected by section 5." Op. at 514 (citing Miller , 295 Kan. at 647, 289 P.3d 1098 ). But I disagree with the majority's analysis of how K.S.A. 60-19a02 impacts the common-law right or the test to be applied. Using the quid pro quo test, I view Miller as persuasive and conclude K.S.A. 60-19a02 does not violate section 5. Thus, I dissent. And because I reach that conclusion I must consider Hilburn's section 18 claim. For the issue presented today, the two sections go hand-in-hand because Miller applied the same quid pro quo test to both sections 5 and 18. Miller , 295 Kan. at 657, 289 P.3d 1098.
In reaching this conclusion, I reject Hilburn's position on the four issues she preserved in her petition for review. Each of them focuses on the panel's application of the quid pro quo test and Miller to the factual and legal circumstances of Hilburn's claim. Hilburn's four issues can be distilled into a single question: Has Hilburn received an adequate substitute remedy for the limitation caused by the noneconomic damages cap in K.S.A. 60-19a02 on her section 5 and *536 section 18 rights to have the jury determine-and to have judgment for the full amount of-her noneconomic losses? I conclude she has.
I reach this conclusion by extending the rationale in Miller , which applied the same quid pro quo test to both sections 5 and 18. Under this test, K.S.A. 60-19a02 does not violate either section 5 or 18 so long as it (1) is reasonably necessary in the public interest to promote the public welfare; and (2) the Legislature has substituted an adequate statutory remedy for the modification of the individual rights at issue. Miller , 295 Kan. at 657, 289 P.3d 1098.
Before us, Hilburn disputes only the second prong of the test. She did not seek our review of the Court of Appeals panel's conclusion that the damages cap satisfies the first prong. As a result, she failed to preserve for this court's review any aspect of that portion of the panel's analysis. See Snider v. American Family Mutual Ins. Co. , 297 Kan. 157, 172, 298 P.3d 1120 (2013). For this appeal, the cap thus satisfies the first prong-it is reasonably necessary in the public interest to promote the public welfare. See Hilburn , 52 Kan. App. 2d at 556, 370 P.3d 428.
Under the second prong of the quid pro quo analysis, a court must determine whether the Legislature provided an adequate statutory remedy for the modification of the individual rights at issue. Miller , 295 Kan. at 664, 289 P.3d 1098. This analysis focuses on "the context" within which the impairment of the common law right "operates." See 295 Kan. at 659, 289 P.3d 1098 ("As a medical malpractice plaintiff, Miller's damages cap operates within the context of the comprehensive statutory scheme created in the Health Care Provider Insurance Availability Act."). Analyzing context necessarily means we must decide each case on its own merits. A court thus must consider both the extent of the deprivation and the relative significance of the substitute. See 295 Kan. at 660-62, 289 P.3d 1098 (comparing scope of limitation on noneconomic damages with significance of readily available recovery from doctors' mandatory liability insurance); Bair v. Peck , 248 Kan. 824, 843-44, 811 P.2d 1176 (1991) (reasoning mandatory liability insurance minimums were "a sizeable quid pro quo ... and certainly [were] an adequate substitute remedy for the common-law rights given up by injured malpractice victims.").
Focusing first on the extent of the deprivation, the Miller court determined the cap on noneconomic damages is "very real, [but] limited in its scope." 295 Kan. at 661, 289 P.3d 1098. The court noted the cap's application, which causes a plaintiff to lose some noneconomic damages, is "significantly more serious" than deprivations upheld in other cases. 295 Kan. at 660-61, 289 P.3d 1098 (citing Lemuz , 261 Kan. 936, 933 P.2d 134 [holding statute barring action for corporate negligence against hospital for negligently extending staff privileges to doctor whose malpractice injured plaintiff did not violate section 18 ]; Aves v. Shah , 258 Kan. 506, 524, 906 P.2d 642 [1995] [holding statute immunizing state fund that provides excess liability coverage to doctors from claims based on fund's alleged bad-faith refusal to settle a claim within policy limits did not violate section 18 ]; Bair , 248 Kan. at 845, 811 P.2d 1176 [holding statute immunizing health care providers qualified for excess coverage under state fund from vicarious liability for professional services negligently provided by other fund-covered health care providers did not violate section 18 ]; Manzanares v. Bell , 214 Kan. 589, 599, 522 P.2d 1291 [ (1974) ] [holding statute prohibiting actions for noneconomic loss arising from automobile accidents unless medical expenses exceeded statutory threshold did not violate section 18 ] ).
At the same time, the cap is limited in scope because it does not leave a litigant totally without compensation. Miller and Hilburn were left in a better position than some litigants in other cases in which we had applied the quid pro quo test. See Miller , 295 Kan. at 661, 289 P.3d 1098 (citing Bonin v. Vannaman , 261 Kan. 199, 221, 929 P.2d 754 [ (1996) ] [holding statute of repose barring claims arising from tortious acts committed against minors not brought within 8 years of act did not violate 18-year-old plaintiff's section 18 rights when it barred her tort claims arising from medical malpractice allegedly committed 15 years earlier]; Rajala v. Doresky , 233 Kan. 440, 442, 661 P.2d 1251 [ (1983) ] [holding statute barring civil action *537 against fellow employee for injury compensable under Workers Compensation Act did not violate injured employee's section 18 rights]; Neely v. St. Francis Hospital & School of Nursing, Inc. , 192 Kan. 716, 722-23, 391 P.2d 155 [ (1964) ] [holding statute shielding funds held by bank for nonprofit hospital from garnishment violated judgment creditor's section 18 rights] ).
The second consideration is the significance or quality of the substituted remedy. To satisfy the quid pro quo analysis, the litigant must have been provided "a significant, individualized substitute remedy." See Miller , 295 Kan. at 661, 289 P.3d 1098. Because "a judgment that cannot be collected is worthless," mandatory insurance requirements providing a litigant with a guaranteed source of recovery for the injury for which the capped noneconomic damages are sought may constitute an adequate quid pro quo. See Miller , 295 Kan. at 661-62, 289 P.3d 1098 (holding mandatory minimum primary and excess liability coverage for medical malpractice adequate quid pro quo for cap on noneconomic damages in malpractice lawsuit).
The fact of mandatory minimums, alone, is insufficient, however. The court must also consider the relative balance between the benefits conferred and the right curtailed. In doing so, a court is not required "to look only to a contemporaneous quid pro quo within the same statutory enactment containing the noneconomic damages cap." 295 Kan. at 661, 289 P.3d 1098. "[M]ajor statutory enactments establishing a broad, comprehensive statutory remedy or scheme of reparations in derogation of a previously existing common-law remedy may be subsequently amended or altered without each such subsequent change being supported by an independent and separate quid pro quo." 295 Kan. at 660, 289 P.3d 1098 (citing Lemuz , 261 Kan. at 955, 933 P.2d 134 ). This must be done case by case, and "the proper test to apply is whether the substitute remedy would have been sufficient if the modification had been a part of the original Act. If so, then no new or additional quid pro quo is necessary to support the modification ...." Bair , 248 Kan. at 844, 811 P.2d 1176. Because this test is applied case by case, the Miller court framed its quid pro quo analysis in the context of a damages cap applied in a medical malpractice case governed by the comprehensive statutory scheme created in the Health Care Provider Insurance Availability Act.
Under that Act as it existed when we decided Miller , doctors had to maintain professional liability insurance with policy minimums of at least $ 200,000 per claim and at least a $ 600,000 annual aggregate for all claims made during the policy period. The Act required doctors to elect one of three levels of excess coverage from the state Health Care Stabilization Fund ranging from $ 100,000 to $ 800,000. And the Act required insurers to participate in an apportionment plan to supply insurance to doctors who are unable to obtain insurance "through ordinary methods." Miller , 295 Kan. at 662, 289 P.3d 1098. The Act guaranteed to those who obtain medical care from a doctor that the doctor is insured, and that the insurance would cover damages up to $ 200,000 from primary insurance coverage and another $ 100,000 from the Fund.
Based on these mandatory levels of insurance coverage, the Miller court held an adequate substitute remedy existed for the cap even though Miller's jury had awarded her $ 575,000 in noneconomic damages, for which the district court entered judgment for $ 250,000 as K.S.A. 60-19a02 required. In holding the cap did not violate sections 5 and 18, the Miller court reasoned:
"For Miller, having an available source of recovery of the statutorily mandated minimums provides her with a significant, individualized substitute remedy. And as pointed out by more than one amici , a judgment that cannot be collected is worthless. So under this statutory scheme, Miller has an obvious direct benefit not available to all others." 295 Kan. at 662, 289 P.3d 1098.
Then, considering the cap's amount, the court observed "the legislature's failure to increase the $ 250,000 cap on noneconomic damages over the more than 20 years since it first set that amount is troubling ...." But, despite its concern, the court could not conclude "that the legislature's failure to increase the statutory cap has sufficiently diluted *538 the substitute remedy to render the present cap clearly unconstitutional when viewed in light of the other provisions in the Act that directly and exclusively benefit a medical malpractice plaintiff." 295 Kan. at 665, 289 P.3d 1098.
Likewise, this court held the Health Care Provider Insurance Availability Act provided an adequate substitute remedy when deciding the two earlier cases of Bair and Lemuz . In Bair , the court reasoned that without the mandatory insurance coverage there would be no guarantee of coverage and a fund from which to collect. "That is a sizable quid pro quo, established by the Act, and certainly is an adequate substitute remedy for the common-law rights given up by injured malpractice victims," specifically for loss of the ability to hold defendants liable under a theory of vicarious liability. Bair , 248 Kan. at 843-44, 811 P.2d 1176. In Lemuz , where the elimination of liability for a hospital negligently granting privileges to a doctor was at issue, the court considered whether the reduction in the amount of mandatory insurance from what the court had considered in Bair changed the result. The court held the reduction did not change its holding:
"Absent the amended Act, many Kansas health care providers would not have any malpractice liability coverage, either because they could not qualify for it or could not afford it. Thus, the Act, the Plan, and the Fund still constitute an adequate quid pro quo for the abrogation of the plaintiffs' remedy to bring a corporate negligence action against a hospital, despite the amendments to the Act and Fund. This remedy has not been emasculated to a point where it is no longer a viable and sufficient substitute remedy." Lemuz , 261 Kan. at 956, 933 P.2d 134.
The Lemuz court also noted that the Legislature had supplemented the quid pro quo provided by the insurance requirements by enacting statutes requiring hospitals to "engage in risk management to ensure that all incompetent physicians are discovered and denied staff privileges. With these statutes, the very purpose of the corporate negligence cause of action is fulfilled." 261 Kan. at 958, 933 P.2d 134. But the court reiterated that the mandatory insurance requirements alone were sufficient:
"Under the amended Fund, the minimum amount of medical malpractice insurance the doctor is now required to carry is $ 300,000. If they can prove negligence, the plaintiffs will recover at least $ 300,000. Without the Act and the Fund, the doctor might not have been insured at all and the plaintiffs might have recovered nothing. In a medical malpractice case, the doctor has his or her personal fortune at stake if adequate insurance is not purchased. It is basically the doctor who has little to risk who carries the minimum insurance. The public is benefitted by any insurance that is carried by that doctor. This is, and should be to some extent, a legislative call and we are unable to say that requiring $ 300,000 minimum to be available in every case is so inadequate that it is an inadequate quid pro quo. The plaintiffs herein will personally receive the benefit of the portion of the original quid pro quo that remains-required primary medical malpractice insurance and guaranteed excess medical malpractice insurance." 261 Kan. at 959, 933 P.2d 134.
Enerpipe argues a similar rationale applies because motor carriers have mandatory insurance obligations that guarantee a source from which a plaintiff injured by a motor carrier can collect a damage award. Under Title 49 of the United States Code, the federal secretary of transportation and the Surface Transportation Board have jurisdiction as specified in Title 49, Subtitle IV, Part B, "over transportation by motor carrier and the procurement of that transportation to the extent that ... property ... [is] transported by motor carrier ... between a place in ... a State and a place in another State ...." 49 U.S.C. § 13501 (2012). The Code defines "motor carrier" as "a person providing motor vehicle transportation for compensation." 49 U.S.C. § 13102(14) (2012). Motor carriers must be registered under U.S.C. Title 49, Subtitle IV, Part B, Chapter 139, in order to legally operate. 49 U.S.C. § 13901(a) (2012). Registration is permitted only if the Secretary of the United States Department of Transportation (USDOT) determines the *539 prospective registrant complies with several requirements, including "the minimum financial responsibility requirements established by the Secretary ...." 49 U.S.C. § 13902(a)(1)(A)(vi) (2012). The Code directs the Secretary to prescribe regulations imposing minimum levels of financial responsibility-not less than $ 750,000-to cover public liability and property damage "for the transportation of property by motor carrier or motor private carrier." 49 U.S.C. § 31139(b)(1)(b), (2) (2012) ; see 49 C.F.R. § 387.9 (adopting minimum levels of financial responsibility). Regulations define "financial responsibility" as "the financial reserves (e.g., insurance policies or surety bonds) sufficient to satisfy liability amounts set forth in this subpart covering public liability." 49 C.F.R. § 387.5. They define "public liability" as "liability for bodily injury or property damage." 49 C.F.R. § 387.5.
The parties agree these regulations apply here. Hilburn stated in her brief to the Court of Appeals that the semi-truck that hit her vehicle was a motor carrier, was registered and titled in Texas, was engaged in interstate commerce at the time of the accident, was over 47,000 pounds, was 50 feet long and had 5 axles, and was registered with the United States Department of Transportation. She added: "The fact that the semi had a [US]DOT number alone indicates that the [US]DOT has exercised its jurisdiction over the semi-truck. See Vanartsdalen v. Deffenbaugh Indus ., 2011 U.S. Dist. LEXIS 28279, [2011 WL 1002027] (Dist. Kan. [March 18] 2011)."
In Enerpipe's reply, it agreed with these facts and said that the federal regulations required it to maintain a minimum of $ 750,000 in liability insurance. Hilburn responded by agreeing with that representation and citing 49 U.S.C. § 31139(b)(2) ; 49 C.F.R. § 387.301(a), and Carolina Cas. Ins. Co. v. Yeates , 584 F.3d 868 (10th Cir. 2009).
Kansas statutes also apply to vehicles using Kansas roadways. As applicable here, "[n]o public motor carrier of property or passengers or private motor carrier of property or local cartage carrier shall operate any motor vehicle for the transportation of either persons or property on any public highway in this state except in accordance with" the Kansas motor carrier laws. K.S.A. 66-1,111. The Kansas Corporation Commission (KCC) has "full power, authority and jurisdiction to supervise and control motor carriers as defined in K.S.A. 66-1,108...." K.S.A. 2010 Supp. 66-1,108b ; see also K.S.A. 66-1,112(a) (granting KCC authority over motor carriers of property). The Legislature has also charged the KCC with adopting safety rules and regulations with which public and private motor carriers of property must comply as a condition of operating "any motor vehicle on any public highway in this state ...." K.S.A. 66-1,129.
Kansas has also integrated with the regulatory network established through the federal system. Kansas statutes make it "unlawful for any private motor carrier to operate as a carrier of property or passengers within this state either in intrastate commerce or in interstate commerce without first having obtained from the commission a license or permit or without being registered pursuant to federal statutes." K.S.A. 66-1,115. And the Act makes it "unlawful for a public motor carrier of property, of household goods or of passengers to operate in interstate commerce regulated by the relevant federal agency without registering its motor vehicles in its base state pursuant to federal statutes in order to operate in Kansas." K.S.A. 66-1,116(a).
The Kansas laws apply only to the extent not preempted by federal law. Federal law generally preempts state legislation "related to a price, route or service of any motor carrier ... or any motor private carrier ... with respect to the transportation of property." 49 U.S.C. § 14501(c)(1). But it does not, among other things, "restrict ... the authority of a State to regulate motor carriers with regard to minimum amounts of financial responsibility relating to insurance requirements and self-insurance authorization ...." 49 U.S.C. § 14501(c)(2)(A).
Under its authority to supervise public motor carriers to the extent not preempted by federal law, to issue permits to private motor carriers, and to promulgate motor carrier safety rules and regulations, the KCC has generally adopted the requirements of *540 49 C.F.R. pt. 387. See K.A.R. 82-4-3e ; see also K.A.R. 82-4-3n (2016 Supp.).
Insurance is mandated by both federal and Kansas law. The KCC regulations prohibit public motor carriers and contract motor carriers of property, household goods, and passengers and private motor carriers of property or household goods from "operat[ing] a motor vehicle, trailer, or semitrailer for the transportation of persons or property within the provisions of the motor carrier law of this state until an insurance policy is filed in accordance with K.S.A. 66-1,128." K.A.R. 8-4-21. "Each policy of insurance filed with the commission for approval shall be in amounts not less than the minimum of liability required under K.S.A. 66-1,128...." K.A.R. 82-4-23(f). For motor carriers subject to KCC licensure, the Legislature has charged the KCC with setting insurance limits at:
"reasonable amounts as the commission determines by rules and regulations is necessary to adequately protect the interest of the public with due regard to the number of persons and amount of property involved. Such amounts shall be not less than $ 100,000 for personal injury or death to any one person in any one accident, $ 300,000 for injury or death to two or more persons in any one accident and $ 50,000 for loss to property of others in any one accident, which liability insurance shall bind the obligors to pay compensation for injuries to persons and loss of damage to property resulting from the negligent operation of such carrier." K.S.A. 66-1,128(a).
Enerpipe asserts it is subject to these requirements. The record lacks sufficient information to verify that assertion. Perhaps only Enerpipe's base-state's requirements and the federal regulations define the level of its insurance coverage. Regardless, through the web of federal regulations that Kansas has incorporated into its framework, the parties agree Enerpipe had to have at least $ 750,000 in insurance coverage.
The Court of Appeals panel held this motor carrier insurance scheme was an adequate substitute remedy because, "[a]lthough the required insurance amounts are different, [the scheme] behaves similarly to the medical malpractice insurance one" by providing Hilburn with "a reliable source of recovery." 52 Kan. App. 2d at 558, 370 P.3d 428. Hilburn did not persuade the panel that the insurance benefitting her was mandated by the federal government, rather than the Kansas Legislature. See 52 Kan. App. 2d at 558, 370 P.3d 428. The panel also discounted the fact that the federal government might have mandated this insurance coverage because Kansas also regulates motor carriers by granting the KCC regulatory authority, and because the KCC has adopted the federal minimums. It further noted Kansas has insurance minimums independent of the federal scheme, designed to ensure all motor carriers have sufficient insurance to protect the public. 52 Kan. App. 2d at 556-57, 370 P.3d 428 (citing Marriott v. National Mut. Cas. Co. , 195 F.2d 462, 466 [ (10th Cir. 1952) ] ).
Hilburn argues the panel erred in holding the motor carrier laws provide an adequate substitute because Miller turned on "a connection between the [Health Care Provider Insurance Availability Act] and K.S.A. 60-19a02" but "[t]here is no temporal or historical tie between K.S.A. 60-19a02 and financial responsibility requirements for foreign motor carriers involved in interstate trucking." She argues "[t]he cost and availability of medical malpractice insurance was at the heart of the Supreme Court's decision in Miller upholding the non-economic damages cap." Hilburn also argues the "mere adoption of federal motor carrier insurance requirements by a Kansas administrative agency" is not "on the same level as comprehensive health care legislation unique to Kansas implemented as a substitute for rights taken away by K.S.A. 60-19a02." And she argues federal law imposes the insurance minimums and that the KCC could impose neither a lower nor a higher limit, citing 49 C.F.R. § 355.25(a).
Importantly, Hilburn does not argue the minimum insurance coverage mandated by these laws fails to supply guaranteed recovery in an amount necessary to satisfy the quid pro quo analysis. Like the Health Care Provider Insurance Availability Act's insurance requirements, the motor carrier laws and regulations make, for plaintiffs like Hilburn, "the prospects for recovery of at least the statutory minimums directly available as *541 a benefit ... when there is a finding of liability. This is something many other tort victims do not have." Miller , 295 Kan. at 662, 289 P.3d 1098.
As to Hilburn's remaining arguments, I would conclude: (1) the lack of a temporal or historical connection between the cap and the motor carrier laws does not matter; (2) Kansas law need not be the sole source of the substitute remedy; and (3) the substitute remedy of mandatory insurance is created by the comprehensive regulatory network of federal and state law and that network of laws provides an adequate substitute remedy for the damage cap.
As to the first point, the temporal or historical connection between motor carrier laws and the cap are not relevant to whether one supplies an adequate substitute for the other. As noted above in the discussion of Lemuz , under the second step of the quid pro quo analysis, the court need not look only to contemporaneous quid pro quo within the same statutory enactment containing the cap. See Lemuz , 261 Kan. at 959-60, 933 P.2d 134. Also, in determining whether there was an adequate substitute remedy for the cap's application, the Miller court noted simply that "[a]s a medical malpractice plaintiff, Miller's damages cap operates within the context of the comprehensive statutory scheme created in the Health Care Provider Insurance Availability Act." 295 Kan. at 662, 289 P.3d 1098. The decision did not suggest, however, that the court could only look to the Health Care Provider Insurance Availability Act as a potential substitute for the cap because of a particular relationship between the two. Rather, the two provided the context of the case because both applied under the facts. In fact, while the cost and availability of medical malpractice insurance was central to the court's analysis under the first step of the quid pro quo test about whether the cap served a public policy purpose, it was not central to the court's second-step analysis. See 295 Kan. at 661-62, 289 P.3d 1098.
In addition, in Samsel v. Wheeler Transport Services, Inc. , 246 Kan. 336, 337, 362, 789 P.2d 541 (1990), the court upheld the damage cap against a facial section 5 and 18 challenge. Samsel answered a certified question from the United States District Court for the District of Kansas that broadly applied to all tort plaintiffs-not just those bringing a medical malpractice action-and essentially asked if the damage cap was facially unconstitutional. In answering that it was not, the court broadly discussed the availability and affordability of all liability insurance, not just insurance covering medical malpractice. This analysis applies here even though Miller overruled Samsel because Samsel "premised its inquiry at step two on an interpretation of K.S.A. [60-19a02(d) ] ... that we cannot accept." 295 Kan. at 658, 289 P.3d 1098. That premise related to how the reduction of damages would operate under the statute. This disagreement did not impact Samsel 's suggestion that the cap can be constitutionally applied to plaintiffs other than those injured by medical malpractice, however. The essential point I take from Samsel is that a public policy relationship between the damage cap and the substitute remedy suffices.
I thus conclude a temporal or historical connection between the laws that supply the substitute and the cap is unnecessary.
Second, Hillburn argues the substitute remedy must be found in Kansas statutes and we cannot rely on the $ 750,000 policy limit mandate of federal law. Granted, our caselaw strongly suggests-but does not hold-that the substitute remedy must be found in a state statute. Step two of the quid pro quo analysis in the caselaw turns on whether "the legislature substituted an adequate statutory remedy for the modification to the individual right at issue." (Emphasis added.) Miller , 295 Kan. at 657, 289 P.3d 1098 ; see Bair , 248 Kan. 824, Syl ¶ 11, 811 P.2d 1176 ("The legislature can modify the common law so long as it provides an adequate substitute remedy for the right infringed or abolished." [Emphasis added.] ).
These statements appear to be more artifacts of the context of the cases than a statement of a requirement, however. In every quid pro quo case to date, the source of the substitute remedy found to satisfy the second step of the quid pro quo inquiry has been state law. See Miller , 295 Kan. at 663, 289 P.3d 1098 (holding medical malpractice *542 insurance minimums mandated by state law provided substitute for limitation on noneconomic damages); Lemuz , 261 Kan. at 959, 933 P.2d 134 (holding medical malpractice insurance minimums mandated by state law provided substitute for ban on corporate negligence claim against hospital providing staff privileges to tortfeasor-doctor); Aves , 258 Kan. at 523-24, 906 P.2d 642 (holding medical malpractice minimums mandated by state law provided substitute remedy for bar on bad-faith refusal claims against state-run excess liability insurance fund); Bair , 248 Kan. at 843-44, 811 P.2d 1176 (holding medical malpractice minimums provided substitute remedy for abrogation of vicarious liability claim against health care provider's employer); Samsel , 246 Kan. at 362-63, 789 P.2d 541 ; see also Rajala , 233 Kan. at 441, 661 P.2d 1251 (holding Workers Compensation Act's abrogation of right to sue fellow employee in tort did not violate section 18 because the Act "removes certain common law remedies for injured employees but provides a statutory substitute therefor," which "is basically a matter of public policy"); Manzanares , 214 Kan. at 599, 522 P.2d 1291 (holding KAIRA's partial bar on recovery of noneconomic loss arising from automobile accidents did not violate due process by taking a property right without compensation, and commenting that because KAIRA assures prompt payment of economic losses, to the extent that it limits ability to recover nonpecuniary damages the right received in exchange is "no less adequate").
Nothing in these decisions mandated that Kansas law be the sole source of the substitute remedy, however. Rather, the cases broadly require an available remedy. For example, Miller established that an "available source of recovery" from mandatory insurance coverage can constitute an adequate substitute remedy. Miller , 295 Kan. at 662, 289 P.3d 1098. More generally, this court's caselaw has
"long recognized, at least tacitly, that major statutory enactments establishing a broad, comprehensive statutory remedy or scheme of reparation in derogation of a previously existing common-law remedy may be subsequently amended or altered without each such subsequent change being supported by an independent and separate quid pro quo." Bair , 248 Kan. at 842, 811 P.2d 1176.
The evaluation of the substitute remedy's adequacy therefore turns on the balance of the derogation of the plaintiff's rights and the available substitute at the time of the section 18 challenge, regardless of the source of the mandate. See Bair , 248 Kan. at 843-44, 811 P.2d 1176 (holding medical malpractice insurance requirements existing "[a]t the time of the malpractice alleged by the plaintiff" were adequate to support amendment eliminating vicarious liability claims against doctors' employers because quid pro quo would have been sufficient if amendment was part of original Act); see also Miller , 295 Kan. at 662-65, 289 P.3d 1098 (considering "continued adequacy of the $ 250,000 limitation that has admittedly devalued over time due to the legislature's failure to adjust it" but concluding failure to increase the cap had not "sufficiently diluted the substitute remedy to render the present cap clearly unconstitutional when viewed in light of [other statutory provisions] that directly and exclusively benefit a medical malpractice plaintiff"). If an adequate substitute for a common-law right infringed upon is mandated and available, the purposes of sections 5 and 18 are satisfied.
In a damages cap case, the Kansas Constitution guarantees the litigant gets the benefit of something valuable in place of the loss of the right to be made whole through damages. See Miller , 295 Kan. at 656, 289 P.3d 1098 (discussing purpose of right to damages protected by section 18 ). This guarantee is not undermined based on how the exchange occurs. The caselaw shows the quid pro quo test is satisfied when the litigant gets the benefit of the guarantee. It does not matter whether the Legislature provided for the guarantee when it infringed on the right, see Manzanares , 214 Kan. at 599, 522 P.2d 1291 ; or whether the Legislature infringed the right after providing for the benefit, see Bair , 248 Kan. at 843-44, 811 P.2d 1176, and Rajala , 233 Kan. at 441-42, 661 P.2d 1251. As for mandatory insurance requirements, the quid pro quo is the assured recovery of one's *543 judgment-or a substantial enough part of it. See Miller , 295 Kan. at 662, 289 P.3d 1098.
Finally, I would hold the network of laws that provides this guarantee of recovery through mandatory insurance satisfied the test. Even assuming Enerpipe carried insurance only because of federal requirements, motor carrier regulation cannot be easily characterized as exclusively a state or federal product. Kansas has incorporated federal law into its regulations. Plus, a review of motor carrier regulations reveals that motor carriers are governed by interrelated schemes of state and federal regulation imposed through statutes and through administrative agencies tasked with implementing the statutes. Which laws control a given aspect of motor carrier operations may depend on the type of carrier; the cargo carried; the origin, destination, and travel route of the subject cargo; and the subject of the regulation, e.g., financial responsibility and driver and vehicle requirements. See 49 U.S.C. § 14501(a)(2), (c)(2)(A) (outlining areas related to motor carriers of persons and property in which states' regulatory authority not limited); K.S.A. 66-1,129(a) (outlining areas in which KCC has regulatory authority over motor carrier safety).
The regulation of entities operating commercial vehicles in interstate commerce is only part of these schemes. And whether state or federal laws apply turns on other factors. As the Court of Appeals panel concluded, through Kansas' own statutory scheme the Legislature has regulated motor carriers in a manner complementary to federal law so that all carriers who operate their vehicles on Kansas roadways meet minimum financial responsibility requirements. The Legislature has therefore provided Kansas victims of motor carrier negligence a substantial, individualized remedy in the form of an assured source from which to recover judgments in recompense.
In summary, I conclude (1) the various statutes and regulations mandating motor carrier liability insurance and K.S.A 60-19a02 are reasonably necessary in the public interest to promote the public welfare and (2) through these statutes and regulations, the Legislature has substituted an adequate statutory remedy for Hilburn's right to have a jury determine her damages. Because I reach these conclusion, I need not discuss the parties' arguments about the KAIRA. My conclusions that the motor carrier liability insurance requirements satisfy the quid pro quo test means that, in my view, K.S.A. 60-19a02 does not violate Hilburn's rights under either section 5 or section 18 of the Kansas Constitution Bill of Rights.
Biles, J., joins the foregoing dissenting opinion.